Deborah SCHOONOVER, Plaintiff,

v.

SCHNEIDER NATIONAL CARRIERS, INC., Defendant.

No. 4:06–cv–00042–JEG.

United States District Court, S.D. Iowa, Central Division.

June 26, 2007.

Michael J. Carroll, Kodi A. Petersen, Babich Goldman Cashatt & Renzo PC, Des Moines, IA, for Plaintiff.

Dennis P. Ogden, Christopher L. McDonald, Belin Lamson McCormick Zumback & Flynn, P.C., Des Moines, IA, for Defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT·

GRITZNER, District Judge.

This matter comes before the Court on a Motion for Summary Judgment filed by Defendant Schneider National Carriers, Inc. (Clerk's No. 19). Plaintiff Deborah Schoonover is represented by Michael Carroll and Kodi Peterson. Defendant Schneider National Carriers, Inc. ("Schneider"), is represented by Dennis Ogden and Christopher McDonald. Following a May 7, 2007, hearing, this matter is fully submitted and ready for disposition.

## FACTUAL AND PROCEDURAL HISTORY

### I. Factual Allegations.[1]

#### A. Introduction.

Defendant Schneider National Carriers, Inc. ("Schneider"), is an international pro-

---

1. The facts relied upon by the Court are either undisputed or viewed in the light most favorable to the Plaintiff. *See* discussion at p. 1127–28, *infra.* In the absence of indepen-

vider of trucking, transportation, logistics, and intermodal services headquartered in Green Bay, Wisconsin. The company employs approximately 15,000 truck drivers, each of whom is assigned to one of fifteen Schneider Operating Centers scattered throughout the United States. One such Operating Center is found in Des Moines, Iowa, which supports between 700 and 1,000 drivers.

Each of Schneider's over-the-road truck drivers are paid a rate per mile determined by seniority, driving experience, and other factors. Solo drivers are paid at the lowest end of the spectrum but would graduate to a higher level the longer they stayed with the company.[2]

Plaintiff Deborah Schoonover applied to work as a driver for Schneider on January 14, 2003, by submitting an application for employment to the company's Recruiting Department, which has exclusive authority to hire truck drivers.

Schoonover agreed that if she were offered employment, it would be at will and could be terminated "at any time, without recourse." Def.App. 80 (application for employment); *see also* Def.App. 86 (indicating Schoonover "recognize[d] and agree[d] that [her] employment [was] strictly at will and [could] be terminated by Schneider at any time, without cause"). She acknowledged that failing to update any information she provided, or "providing false, misleading or incomplete statements or data in [the] application and/or supplemental documents" in connection

with the application would be "grounds for immediate termination" of employment, "regardless of when such information is discovered." Def.App. 80. The record shows Schoonover's pay was to be $0.27 for each mile driven. This compensation was commensurate with other similarly situated drivers.

Schneider offered Schoonover a job as a solo driver. Before Schoonover was permitted to drive for Schneider, the company required Schoonover to attend a driver training program in Green Bay, Wisconsin, to allow her to obtain a commercial driver license. After training, Schoonover was assigned to the Des Moines Operating Center. Schneider terminated Schoonover's employment on August 20, 2003, for allegedly providing false information in certain medical forms included in her employment application materials.

## B. Schneider's Personnel and Operations.

Sheri Houdesheldt worked as a Service Team Representative in the Des Moines Operating Center from January 2000 through September 2003. Houdesheldt provided day-to-day support for truck drivers but lacked managerial or supervisory authority over them. She routinely communicated with all drivers assigned to her, one of whom was Schoonover. Jeff Morse has been employed by Schneider for approximately nine years as a service team leader or senior service team leader in the Des Moines Operating Center. As

---

dent facts, the Court has had to rely heavily on the testimony of the Plaintiff to illustrate her claims of discrimination, while recognizing conclusory allegations are insufficient to generate a genuine issue of material fact. *See* discussion at p. 1127, *infra.* The manner in which this case has been presented and argued by the Plaintiff requires an extensive discussion of the facts and law.

**2.** Each driver is allowed advances for expenses, meaning that at the conclusion of some pay periods, a driver might owe money to Schneider. That money was then deducted from the driver's next paycheck. Schoonover Dep. 15:20–25; *see also* Def.App. 149, 152–154, 162–163, 168, 171 (a subset of Schoonover's pay stubs where advances exceeded earnings).

a senior service team leader, Morse managed service team representatives, trained service team leaders, managed drivers, and provided customer service. She could also terminate the employment of Schneider's drivers. Morse reported to Team Operations Manager Marla Williams.

Since at least 2003, Williams has served as the Des Moines Operating Center's Team Operations Manager. Williams ensured service team leaders followed corporate procedures and processes and properly worked through issues that arise during the day. Williams reported to Operating Center Manager Lisa Gonnerman, who was the highest ranking Schneider employee at the Des Moines facility.

The Des Moines Operating Center des not assign trucks to drivers. Schneider's Tractor Network Center handles that function. Schoonover agrees this is true but notes that when she would experience mechanical problems with her equipment, she would contact her supervisors at the Des Moines Operating Center.[3]

The Tractor Network Center uses a Van Tractor Assignment Policy "to ensure the right tractors are assigned to all work configurations and that appropriate drivers are assigned to drive them." Def.App. 72. The policy lists a variety of factors to consider, including mileage on the truck and the seniority and past performance of the driver. There is no specific record that a driver's gender is among the factors weighed. Under the policy, new solo drivers like Schoonover received the lowest priority for truck assignments. Because new drivers in Schoonover's position typi-

cally received old equipment, it was "fairly common" for the vehicles they drove to experience mechanical problems. Houdesheldt Dep. 21:6–22:4; Schoonover Dep. 54:3–55:2 (explaining her understanding that new drivers did not receive new equipment to use). As a result of mechanical problems, new drivers would frequently be shifted to drive several different trucks in the early days of their employment. The record shows that during the course of her employment with Schneider, Schoonover was assigned to drive at least four different trucks.

Schoonover admits the Van Tractor Assignment Policy exists but argues that in practice some factors are considered when making assignments and others are not, adding that Schneider's management still may have at least some role in truck assignments.[4] However, beyond a broad understanding that she would receive equipment upgrades the longer she stayed with the company, Schoonover confessed to having no knowledge about who makes truck assignments or the processes or criteria used. She also provided no specific examples of situations where only some of the required factors were used by the Tractor Network Center to assign any vehicle.

In addition to equipment assignments, drivers are also provided routes to drive. Schoonover was cognizant of the general method used to assign work:

Q: Can you tell me how loads were assigned to you?

---

**3.** *See* Schoonover Dep. 48:24–50:15 (recalling complaints lodged with Morse about the style of truck she was driving, to which Morse purportedly responded by stating that "he would get it changed"), 55:12–22 (testifying that Morse was "the one [she] was in communication with" with respect to equipment assignments).

**4.** *See* Schoonover Dep. 48:24–50:15 (testifying Morse indicated he would "take care of" a complaint regarding the equipment); Morse Dep. 34:25–35:5 (testifying he did his "absolute best" to remedy complaints about equipment).

A: I don't know. They—I would put in an end macro to my—on my computer, and after so long a load would come up. The computer would beep. I would either call [Morse] or [Houdesheldt] if I had questions on the load.

Q: Okay. And you would put in—it was your responsibility ... to put in something on the QUALCOMM system that told them you were ready to take another load; is that right?

A: That I had ended that load, yes.

Q: And do you know where that communication would go to?

A: No.

Q: Would it be a surprise to you if that communication ended up in Green Bay somewhere?

A: I don't believe it did.

Q: Where do you believe it went?

A: I believe it went to my [Service Team Leader].

Q: Okay. Well, all right. But you're not sure who it went to?

A: No.

Q: And what would happen, then, once you told them you were ready for a load is you would be communicated with again on the computer telling you what load was next?

A: Yes.

Q: And you don't know where that communication came from, do you?

A: No.

Q: You assumed it came from [Morse] or someone who was your [Service Team Leader]?

A: Yes.

Q: But it may have come from somewhere else; you don't know?

A: It could have, yes.

Schoonover Dep. 133:12–134:25.[5] Schneider fills in the details regarding work assignments. The Transportation Planning Department in Green Bay, Wisconsin, schedules loads for Schneider's drivers. Employees known as transportation planners are vested with final decision-making authority for all work assignments, and no person outside the department can override an assignment. Transportation planners use a computer program called Global Scheduling System ("GSS") to assign routes. The program maximizes efficiency and profitability by weighing a variety of factors, including driver location, hours of availability, dates of availability, equipment availability, customer needs, and other factors. Defendant contends the focus is on efficiency, not the sex of the drivers.

The GSS system allows for limited flexibility in route assignments. For example, while drivers can request to be home for specific days, Schneider cannot guarantee a driver's return on a specific date because schedules depend heavily on the movement of freight, company needs, and driver availability. Thus, drivers would sometimes miss important events at home. A driver could appeal an unfavorable assignment to the service team leader or service team representative, who would then contact the transportation planners to attempt to negotiate a plan so the driver could return home. In other words, an Operating Center could attempt to intervene on a driver's behalf, but if a change was made, it would come from the transportation planners.

---

**5.** *See also* Schoonover Dep. 58:19–59:6 (establishing Schoonover lacked personal knowledge regarding who provided her with work assignments, how those decisions were made, or what criteria were used).

Schoonover points out that in some cases, transportation planners must make adjustments. For example, a work assignment can be shifted if a driver experiences a medical emergency and is physically incapable of driving. She adds that while the GSS program may not consider a driver's sex, transportation planners might. However, she has identified no transportation planner who manipulated or failed to follow proper procedures when assigning equipment to Schoonover or any other driver.

### C. Overview of Schoonover's Employment.

### 1. Equipment Assignments.

Schoonover's first solo run occurred on April 22, 2003. This trip was made in a cabover truck.[6] Schoonover argues she should not have been assigned to a cabover because she and two trainers had informed Morse she would be unable to drive that style of truck because of large breast size. After complaining to Morse, Schoonover was assigned to a different truck.[7]

Even though Schoonover was removed from the cabover truck for a reason uniquely situated to her being female, she conceded her assignment to that style of truck was not discriminatory:

Q: .... Well, are you saying that [Morse] intentionally assigned you that truck because you are a woman?

A: No.

Q: All right. So my understanding was you believed that this truck was assigned to you because of discrimination?

A: No.

Q: Okay. So you don't believe that?

A: I didn't believe that at the time, no.

Q: Okay. That wasn't my question ma'am. Do you believe that now?

A: I believe, looking back, it was a menagerie of the things that happened that were discrimination, not that one—. At the time I didn't believe that one thing was discrimination. I didn't believe that the cabover was discrimination.

Q: I know you didn't believe that at the time, but are you saying you believe that now?

A: Yes.

Q: So you believe that [Morse] intentionally assigned you a cabover truck because you were a woman?

A: *Not on gender, no.*

. . . .

Q: ... You're saying that [Morse] intentionally did things to you that were discriminatory because you're a woman?

A: No.

Schoonover Dep. 60:14–61:12; 62:15–18. Schneider points out Schoonover expected that she would be placed in a cabover truck at the time of her hire.

A second truck was assigned to Schoonover. The second truck was equipped with a conventional cab. Schoonover agrees her assignment to this truck was not an act of discrimination. The second truck

---

**6.** In a cabover truck, the cab is directly above the engine. In a conventional model, the cab sits behind the engine, similar to a car.

**7.** Schoonover notes many of the trucks to which she was assigned were not clean and required an investment of her time to prepare

them for travel. While these actions may be relevant to demonstrate she lost money when she was cleaning instead of driving, these experiences are ultimately not relevant because she points to no similarly situated male employee who was provided a clean truck.

was soon taken out of service, but Schoonover concedes the truck was not taken out of service or dismantled to discriminate against her.

■ Schoonover was assigned to a third different truck.[8] After a time, she dropped this truck at an Operating Center in Gary, Indiana, so she could rent a car to return to Iowa for her daughter's wedding.[9]

While Schoonover attended the wedding, the truck Schoonover left in Indiana was reassigned, and Schoonover was given a different truck. Schoonover testified as follows when she was asked whether she felt the reassignment of this vehicle was discriminatory:

> Q: Now, are you saying that the fact that you were reassigned a truck at that point or the truck was reassigned and you were sent to another truck was discrimination?
>
> . . . .
>
> A: That is just one part of it, yes.
>
> Q: So what you're saying is that you believe that the truck in Gary was reassigned and you were sent to a different truck . . . because of discrimination? A: It was one of the aspects that led up to the discrimination, yes.
>
> Q: . . . . Do you think that they did that because you were a woman . . . or for some other discriminatory reason?
>
> A: No. Not—not wholly, no.
>
> Q: Okay. And when you say wholly, I'm assuming you're not referring to holy as in God, but wholly as in *whole or in part*; is that right? [10]
>
> A: Yes.
>
> . . . .

8. By and large, the parties have provided a poor record regarding the timing of the majority of Schoonover's truck assignments.

At some point—the Court is unable to readily determine precisely when—Schoonover was required to drive to Minnesota to pick up a truck that had been abandoned. Before leaving for Minnesota, she requested to be assigned to a Volvo that was at the Des Moines Operating Center. This request was apparently denied at the time. When Schoonover began driving the truck she retrieved in Minnesota, the vehicle experienced brake problems and was taken out of service for about a week. Schneider eventually decided to have the truck serviced in Des Moines, so Schoonover drove it to Des Moines. After being repaired, the truck from Minnesota was assigned to someone else, and Schoonover was given the Volvo she had previously requested. While Schoonover felt her assignment to the truck in Minnesota followed promptly by a reassignment to the Volvo in Des Moines was discriminatory, she supported her allegation only by stating that "a woman is an easy mark . . . in [the] industry." Schoonover Dep. 105:21–22. An employee's subjective speculation regarding an industry's view of women in general is not evidence that *her employer* acted in a discriminatory way. Therefore, her trip to Minnesota cannot support her sex discrimination claim. The Court also concludes Schneider's decision to eventually assign Schoonover to a vehicle she requested does not support a claim of sex discrimination because it is not a discriminatory act.

9. Schoonover got into an argument with an employee at the Gary Operating Center. Schoonover believed a person there was to provide her transportation to a car rental agency. The Schneider employee allegedly told Schoonover she was fired, to get out of "his" Operating Center, and to never come back. At the time, Schoonover wrongly believed he had supervisory authority over her and had fired her. Because Schoonover concedes this interaction was not motivated by any discriminatory animus, the Court concludes any factual dispute surrounding this interaction is not material.

10. It is unclear from the record why counsel felt compelled to clarify this potential malapropism.

Q: So what you're saying is that you think part of the reason they did that was because you were a woman . . . ?

A: No. Not that instance, no.

Q: Okay. So is it fair to say that *you don't believe any of those circumstances really were because somebody wanted to discriminate against you?*

A: *No.*

Schoonover Dep. 31:21–33:4 (emphases added). This testimony reveals Schoonover's belief that the reassignment at least partially displays discriminatory intent. However, she has not buttressed this belief with positive evidence illustrating how the reassignment was discriminatory.

Schoonover used this final truck until the end of her employment. While Schoonover did not experience mechanical problems with this vehicle after July 18, 2003, she did before then. On one occasion, she reported to maintenance personnel that the truck did not sound right when she was preparing to leave Des Moines, but she was told to take the truck and depart on a trip headed east. She reported the truck was experiencing mechanical problems near Walcott, Iowa,[11] but was forced to drive the truck to the Operating Center in Indiana. When she arrived, the truck required significant repairs.

Schoonover viewed her equipment assignments in the aggregate as discriminatory because male drivers with whom she trained did not experience changes with the same frequency:

Q: Okay. And are you saying that you believe that your experience with changing trucks, being different than what you would call normal, was the result of discrimination?

A: Yes.

Q: Okay. Can you give me the facts that you base that on?

A: Other students in my same class did not change trucks as often as I did. They went from their cabover to a conventional, and in the time of employment, that was the only change that they had made was one change. [sic]

Schoonover Dep. 37:14–25; *see also* Schoonover Dep. 38:7–39:1 (testifying that "several drivers"—including at least one female—had the same truck each time she saw them, whereas she had a different vehicle). However, when pressed, she could not remember who the male classmates were or when she spoke with them. In addition to observations of her co-worker's vehicles, Schoonover points to comments made by a trainer at the Des Moines Operating Center who joked that the number of times Schoonover was reassigned seemed high. Moreover, based on the "industry standard" as represented in trade magazines, Schoonover believed repeated reassignments without corresponding upgrades in equipment were unusual. Schoonover claims she complained about her perpetual reassignments to Morse and Houdesheldt, but she was ignored.

Responding, Schneider argues Schoonover's receipt of inferior equipment was not based on her sex but was based on the fact that she was a new, inexperienced driver.

## 2. Route Assignments.

One contested issue is the importance of the fact that most of Schoonover's routes either originated or terminated east of the

---

11. Walcott, Iowa, is approximately fifteen miles west of Davenport, Iowa.

Missouri River.[12] Schoonover argues that compared to routes west of the Missouri River, routes to the east are less desirable because the terrain is generally less flat and roadways are more congested. The implication is that it takes more time to travel the same distance, resulting in less profitable trips. Schneider responds by arguing there is no advantage to working in any particular area of the country. Logic dictates otherwise: Because the time in which a driver traverses a set distance is inversely proportional to the rate at which the driver accumulates pay, a driver forced to traverse hilly terrain and curvy roads earns money less quickly than one driving on flat, straight roads. While the record is factually poor on this issue, when viewed favorably to Schoonover, this set of facts infers westbound trips tended to be more desirable.

Schneider's better argument is based on United States Census Bureau statistics showing that in the year 2000, only 25 percent of all United States residents lived in the West. *See* U.S. Census Bureau, Demographic Trends in the 20th Century 19 fig. 1–7 (2002) (hereinafter "Census Report"), *available at* http://www.census.gov/prod/2002pubs/censr-4.pdf (last visited June 8, 2007).[13] Therefore, Schneider claims, it should not be confounding that a

larger percentage of the destinations to which its drivers delivered cargo to and from are east of the Missouri River. It follows, the argument goes, that Schoonover's routes typically took her east of the Missouri River not because of her sex but because Schneider's drivers were assigned to routes where the most work remained to be performed. In this manner, Schneider contends Schoonover's assignments were no different from any other driver's. The value of the Census Report to the Court is minimal without proof that the distribution of work performed by Schneider approximately mirrors the distribution of America's populous.

Schoonover counters by arranging a phalanx of ways she believes proves she was treated differently than other drivers with respect to route assignments. First, Schoonover notes that on one occasion, she was assigned to pick up a load from a shipper but was then told another company had taken the assignment. The record does not show the assignment went to a male, or that Schneider had any role in the reassignment of the cargo. Schoonover next notes that on a different occasion, she was assigned to deliver a load that would have given her significant mileage but claims she was "pulled off of [the] load for

**12.** Schneider refers the Court to an anthology of payroll statements showing the origination and destination points of Schoonover's trips to illustrate Schoonover's destinations were more diverse than she represents. The record demonstrates Schoonover performed work for Schneider in Alabama, Arkansas, Arizona, Illinois, Indiana, Iowa, Kentucky, Maine, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, Ohio, Pennsylvania, Texas, Utah, Vermont, Wisconsin, and Wyoming.

**13.** Schneider contends the cited statistic proves 75 percent of Americans resided east of the Missouri River in 2000. This is a misinterpretation of the data in the report. The Census Report concludes 22.5 percent of

the United States population resided in the "West," which is one of four regions used by the Census Bureau for certain statistical classifications. *See* Census Report at 18 n. 8. The "West" includes Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming. Census Report, app. B at 7. As a result, some states lying wholly (or mostly) west of the Missouri River and west of the Mississippi River south of the rivers' confluence (*i.e.*, Arkansas, Kansas, Nebraska, Louisiana, Oklahoma, and Texas) are not part of the "West" for purposes of the Census Report. It follows that more than 22.5 percent of the population resides west of the Missouri River.

no reason," Schoonover Dep. 130:11–14, and given a short load going east, Schoonover Dep. 139:1–8; Pl.App. 57 (log entry indicating Schoonover was pulled from a load "for no reason" and assigned to a "short haul going east" because Morse indicated she "shouldn't have been put on [the] load [going west]"). Schoonover does not know whether the westbound assignment was given to a male. While Schoonover claims there were other times where she was removed from loads going west and given easterly destinations, she could not remember when they occurred or where the destinations were.

Despite much conversation about route and equipment assignments, Schoonover has not identified any Schneider employee she believes discriminated against her because of her sex;[14] instead, she identified problems occurring during her employment and concluded she must have had those experiences because she is female:

Q: .... And I think we've talked a little bit about the truck changes. I guess I haven't heard one yet—if I'm understanding what you're telling me. I haven't heard of a truck change yet that you believe resulted from some discrimination.

There was the one in Gary, the going up to Minnesota and being reassigned, and then the cabover ..., but as I understand it, none of those, in your view, resulted from somebody wanting to discriminate against you.

A: I—. Just looking at it collectively—. I can't say at the time that it was purposely done. I'm just looking at it after the fact. It's not normal. None of it was normal.

Q: Okay. Well, and are you saying that there's just no other conclusion, then, you know, you were treated abnormally because you were a woman? Is that what you're saying?

A: Yeah.

Schoonover Dep. 66:5–24. She elaborated:

Q: So you come to the conclusion that somebody had to mean for this to happen to you; is that what you're saying?

A: In my belief, whether they meant for it to happen, they let it continue to happen.

Q: Who is "they"?

A: [Morse], [Houdesheldt]. That was—. I would bring up the problems and they let it continue.

Q: All right. Are you saying that [Houdesheldt] was doing this to you because you were a woman?

A: She very well could have been. At the time I was just trying to get through my year so I could move on, put it behind me, and let it go. I tried not to complain. And in the meeting with [Houdesheldt] and [Williams], I did bring it up, and that's the way that I felt, it was because I was a woman. I asked them if that was the reason.

Q: Okay. What facts that you know led you to believe that [Houdesheldt]

---

14. This statement of fact is derived from a statement of material fact to which Schoonover did not respond. *See* Pl.'s Response to Def.'s Statement of Undisputed Material Facts and Pl.'s Statement of Additional Undisputed and/or Disputed Material Facts ¶ 82. This statement is therefore assumed true for purposes of the pending motion. *See* LR 56.1(b) ("The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact."); *see generally Libel v. Adventure Lands of Am., Inc.,* 482 F.3d 1028, 1032–33 (8th Cir.2007) (affirming decision to deem admitted statements of material facts resisted in a deficient way).

was taking adverse action against you because you were a woman?

. . . .

A: I was sitting broke most of the time. I would call and I—with a safety issue and was told, "Well, take it to the [Operating Center]." Q: Who told you that?

A: [Houdesheldt] would tell me that. And I told her over an air conditioning issue, "I can't take the heat. I will get very sick."

And she said, "Well, you got to wait until you get back into Indiana to have it fixed."

I said, "[Houdesheldt], I can't take the heat." I explained to her that I just had a hysterectomy and the hot flashes with the high heat.

"Well, you'll just have to wait until you get to the Indiana [Operating Center]."

I said, "It needs fixed."

. . . .

Q: But why do you think that it was the result of the fact that you were a woman?

A: I can't name one thing. I just look back and its collective. Yes it was insensitive. Had I pulled in to a scale—had I known at that time to pull in to a scale and pull around back and say, "Inspect it, air conditioner ain't working," they would have been out there to fix it right then and there.

Q: "They" meaning Schneider?

A: Yeah. They would have had to before the truck moved.

Q: Okay.

A: Safety issues, where it was brought up that I was too cautious, and it was by [Houdesheldt], and it was

brought up at that point that it was because I'm a girl.

Q: Okay.

A: Didn't say because I was a woman, said because I was a girl I was a little bit too safety-conscious on—. Because I got really upset about a mechanical issue. . . . And when I had talked to [Houdesheldt], she said, "That's just because you're a girl that you're a little bit more sensitive you know, to those things."

Schoonover Dep. 67:3–69:25. Three immediate observations follow from this testimony. First, despite her limited experience in the industry, Schoonover believed she received an unusual number of equipment reassignments. Second, she believed, for no discernible reason, that her equipment reassignments were based on her sex. Third, Houdesheldt's comments that Schoonover was cautious because she was "a girl" are not relevant because Houdesheldt was not the decisionmaker with respect to Schoonover's route or equipment assignments or Schoonover's ultimate termination.

Regardless of who discriminated against her, Schoonover made clear that she believed Morse did not:

Q: Okay. You're saying that [Morse] intentionally did things to you that were discriminatory because you're a woman?

A: No.

. . . .

Q: Okay. Do you have any reason to believe that [Morse] meant to cause you these problems because you were a woman?

A: No.

Q: So you don't think [Morse] had anything against you because you were a woman?

A: No.

Schoonover Dep. 62:15–18, 64:4–10. In fact, of those at the Des Moines Operating Center with whom Schoonover interacted, Morse "tried to be the fairest of everyone." Schoonover Dep. 159:25–160:9. That does not mean Schoonover believed Morse was harmless:

Q:.... Well, do you have any facts on which you could base a conclusion that [Morse] did anything to you or caused you any problem in your employment with Schneider because you were a woman?

A: I just look at the list of events, and that's the only facts that I have....

Schoonover Dep. 64:16–21. The "list of events" includes the route and equipment assignments discussed above. *See* Schoonover Dep. 64:24–66:4.

### D. The Concluding Days of Schoonover's Employment.

#### 1. Schoonover's Meeting with Schneider Management.

Schoonover met with Williams and Houdesheldt on either August 4 or 5, 2003, regarding what Houdesheldt believed were alleged discrepancies in Schoonover's paycheck. At the meeting, Schoonover contends Williams admitted Schoonover had spent enough time driving east and would try to arrange trips for her elsewhere. Shortly after the meeting, Schoonover departed Des Moines for Wyoming and Utah. Schoonover contends that at this early August meeting she "brought up discrimination." Schoonover Dep. 45:2–7.[15] As evident from the portions of Schoonover's deposition quoted above, Schoonover did not *complain* of discrimination; she noted she received less desirable routes and equipment assignments and

"asked them" if she received those assignments because of her sex.

#### 2. The Investigation into Schoonover's Allergies.

On July 30, 2003, Schneider's Occupational Health Department was notified Schoonover would miss work with a urinary tract infection but would return on August 1, 2003. On August 13, 2003, Schoonover again took herself out of service for issues related to a urinary tract infection. That same day, an employee at the Des Moines Operating Center called her "to see when she was going to be ready to come back to work." Def.App. 33. Schoonover indicated she was afraid she would have an allergic reaction to new medication she was prescribed to treat her urinary tract infection and so removed herself from service. Def.App. 33 (Operating Center notes indicating Schoonover said she could return to work on "[S]at[urday] or [S]un[day] since she was taking a different medicine starting on [T]hurs[day;] she is afraid of an allergic reaction to the medicine and doesn[']t feel safe to [drive] for 24–48 h[ours] after taking the new medication"). After speaking with Schoonover, an employee at the Des Moines Operating Center called Schneider's Occupational Health Department, which advised that Schoonover "would have to provide return to work documentation from a doctor [and would] need documentation on the severe drug allergy." Def.App. 71.

All non-work related medical issues for truck drivers are routed through the company's Occupational Health Department. Wendy Sullivan is Schneider's Occupational Health Manager, and is "responsible for

---

**15.** Schneider concedes the fact that Schoonover mentioned the issue of discrimination at her meeting with Houdesheldt and Williams for purposes of this motion. *See* Def.'s Statement of Undisputed Facts 13 n. 1.

DOT compliance from a medical perspective in the organization" for the company's drivers. Sullivan Dep. 3:4–17. During Schoonover's employment, Sullivan was a nurse in the same department. Her duties were substantially the same, but she was more involved in medical document review, a process where applicants' medical records are examined for potential health problems posing safety concerns. She could not hire or fire drivers; she could recommend an individual's employment be terminated.

Because Schoonover's urinary tract infection was not a work-related injury, the Occupational Health Department became involved. On August 13, 2003, an individual at that department telephoned Schoonover. In the call, Schoonover reiterated that she did not wish to drive because she was fearful of an allergic reaction to her new medication. She stated that she had self-imposed a 24– to 48–hour driving ban. Def.App. 37 (log entry by Sullivan reporting Schoonover indicated she "ha[d] to start a new med again for [an] infection she is fighting and it is her rule that she waits at least 24 hrs to see how she does on a new medication"). Sullivan's notes reflect these limitations grew from a reaction Schoonover had "from a narcotic in the past" and from a concern that she had "passed out once when she got near cocaine." Def.App. 37.

Sullivan told Schoonover her allergic reaction was not disclosed in her employment application materials and that Sullivan would have to check Schoonover's application materials again.

Turning to those materials, the record shows that in January 2003, Schoonover completed a Post Job Offer Medical Questionnaire Form for Schneider. The redacted version of the form contained in the record is not signed by Schoonover. The form provides that "[a]ny false statements" therein would justify an immediate termination "regardless of when such information is discovered." Def.App. 77. This form was apparently filled out over the telephone: the record shows an individual from Schneider asked questions and then transcribed Schoonover's answers. Schoonover's response to question 8 on the form, which called for emergency room visits, is incomplete because it lists no emergency room visits for any allergic reactions.[16]

Also around the time of her application, Schoonover completed and signed a Medical Examination Report for Commercial Driver Fitness Determination, which was required by the United States Department of Transportation. See Def.App. 191–193 (medical report); see also 49 C.F.R. § 391.41, .43 (2006) (setting forth the physical qualifications for drivers and the items covered in a Medical Examination Report).[17] In the Health History section of the report, Schoonover checked that she had not experienced "[s]hortness of breath." Def.App. 191. However, at her deposition, Schoonover testified that she had experienced airway restrictions during allergic reactions to codeine and ampicillin.

Schoonover also indicated in the Medical Examination Report that she had experienced no "[n]ervous or psychiatric disorders, e.g., severe depression," Def.App. 191, but in her Post Job Offer Medical Questionnaire stated that she was treated in 1994 for depression. Schoonover ex-

---

**16.** *Compare* Schoonover Dep. 174:2–15 (recalling an instance occurring in approximately 1997 where she required hospitalization for a codeine reaction), *with* Def.App. 77 (listing emergency room visits made by Schoonover but omitting reference to allergic reactions).

**17.** A sample Medical Examination Report form can be found at 49 C.F.R. § 391.43(f).

plains that she acknowledged suffering from depression at a post-job offer interview but argues her depression is not "severe."

Returning to the Medical Examination Report, Schoonover checked that she had not experienced any "[l]oss of, or altered consciousness" or "[f]ainting [or] dizziness," Def.App. 191; but at her deposition she testified that she repeatedly lost consciousness as a result of allergies to drugs, Schoonover Dep. 175:18:21 (loss of consciousness from the use of an epinephrine autoinjector); 176:6–177:13 (loss of consciousness from administration of cocaine for a dental procedure); 178:18–180:5 (recalling numerous instances where she was present where cocaine was used, resulting in a loss of consciousness because cocaine was "in the air").[18]

Schoonover claims she discussed how to complete the Medical Examination Report with the physician who examined her. After hearing of Schoonover's allergies, the examiner reportedly told Schoonover to indicate she had not lost consciousness because the question was designed to unearth random occurrences liked epilepsy. The record somewhat supports this allegation because the medical examiner noted Schoonover's drug allergies on another form. *See* Pl.App. 61 (medical questionnaire on February 11, 2003, indicating allergies to "cocaine (RX), amp, [and] codeine"). The document disclosing Schoonover's allergies was apparently unseen by Schneider before the company decided to offer her a job.[19]

Schoonover claims Schneider was aware of her medical problems through other channels. For example, Schoonover notes she asked for time off during training because she was taking cold medication and believed it was safer to refrain from driving during that time. Around the same time, she recalls telling Morse she had reactions to certain medications and reiterated her allergies to Morse just before she started driving.

Schneider counters by claiming that many of Schoonover's observations are simply not relevant. For example, because the Recruitment Department hires drivers, comments to individuals outside that department could not have had an impact on the decision to hire Schoonover. Comments by Schoonover to her examining physician are also not relevant because the Recruitment Department relied on the written form Schoonover signed—not the verbal exchange occurring at the examination—to decide whether to hire Schoonover.

### 3. Schoonover's Termination.

After examining Schoonover's medical forms, Sullivan determined she had not disclosed a pre-existing medical condition. Sullivan testified,

Q: .... What was it that you were looking for to be fully disclosed that you believed was not fully disclosed?

A: I believe what was not fully disclosed to the occupational health department was certainly the medication reactions. My main concern

---

**18.** The Court emphasizes that the record contains no indication that Schoonover herself participated in any illegal use of a controlled substance.

**19.** Schoonover also purportedly disclosed allergies on an essay medical questionnaire provided by Schneider after she was offered a position. Schoonover did not retain a copy of this document, and the parties have not noted its inclusion in the papers produced as part of discovery in this action.

was the fact that she indicated to me that she passed out when she got near cocaine. To me, that translates to a concern because, A, that is not a typical reaction. And, B, of course I had some concerns about being around a DOT knock-out drug. And, C, I had some concerns about driving a truck with a predisposition to passing out.

Q: Well, when you use the term, "predisposition," what do you mean?

A: Well, if it was such in her medical makeup that she had severe medication reaction[s], albeit, you know, an antibiotic[ ], albeit, a narcotic, if you know, for example, at the DOT, it is perfectly acceptable to take an antibiotic and drive, but if it is such that she is potentially going to pass out from a bad medication reaction, that would be a concern to me driving a commercial vehicle.

Sullivan Dep. 38:21–39:15. Sullivan informed the Des Moines Operational Center that the Occupational Health Department had no records showing Schoonover suffered from drug allergies or needed to miss work each time she stared a new medication.[20] Def.App. 37; see also Def. App. 76 (fax from Sullivan to Morse indicating the Occupational Health Department "[d]id not know [at] the time of hire [Schoonover] would need to be off 24 [hours] each time she was put on new med[ication] due to [her] allergy history"

and that there was a "falsification" in her application materials).

Because resolution of the pending motion depends largely upon Morse's mental processes in the time frame spanning the end of Schoonover's employment, examination of Morse's testimony in some detail is necessary:

Q: [W]hat caused you to contact Occupational Health about Deb Schoonover?

A: . . . . I received information from Sheri Houdesheldt that we were waiting for a return-to-work document from a physician related to a drug allergy, and so I made contact with the Occupational Health Department inquiring about the situation. . . . [D]uring the course of [the conversations with that department], I learned that this information was not disclosed at the time of hire.

Q: . . . . What was your understanding that you had obtained from Ms. Houdesheldt regarding the drug allergy? What was your understanding?

A: That Deb Schoonover could not return to work because of a drug allergy where she was needing—I don't know what—I think it was 24 to 48 hours time off before returning to work [after] starting a new medication.

. . . .

20. While Sullivan indicated the Occupational Health Department would have considered her application differently at the time of her hire if it had known about her pre-existing medical condition, this observation carries little weight for two reasons. First, Sullivan's observations are speculative: Sullivan cannot say post facto what a different individual in the Recruiting Department would have done if presented with different circumstances. Second, Sullivan's observations are not relevant: Sullivan's opinions regarding whether Schoonover would have been offered a job had she disclosed her pre-existing medical condition in her application materials does not make more or less probable the truth or falsity of either (1) the statements in the forms Sullivan reviewed or (2) Schneider's reason for her termination. Sullivan's comment does, however, demonstrate the material nature of a false or incomplete statement in a driver's medical history.

Q: .... When you learned ... that there was going to be some delay in Ms. Schoonover's return to work because of a drug allergy, did you immediately within the day or two days pick up the phone and call Occupational Health, or did you undertake any other investigation on your own?

A: The investigation would be I called the Occupational Health Department to inquire of what—I guess to confirm what [Houdesheldt] was telling me.

. . . .

Q: .... What prompted your phone call to Occupational Health?

A: Because I was—I wanted to know if they had received a document, and if there was anything as far as a medication or something where it's a ... DOT knockout drug—where a person would be off greater than that. So that is what concerned me and why I would call Occupational Health.

Q: Okay. And what did you learn from Occupational Health?

A: I can't remember the conversation vividly, but I learned from Occupational Health that they had received documentation from the clinic—or a fax or however they receive it—that the Occupational Health Department did not have prior knowledge [of] the drug allergy up to that point.

. . . .

Q: .... Did you ask Occupational Health whether it had done any investigation of whether Ms. Schoonover had disclosed any allergies or drug allergies around the time of her hire?

A: Yes.

Q: What did they tell you?

A: Well, first of all, it was not disclosed at the time of hire. That would be what they—. When I called up there to ask about the situation with Occupational Health, that was what my communication was inquiring, if we knew of this. So they couldn't have investigated it if they did not know about it at the time of hire.

So my investigation was—. The first time I investigated the situation was when Sheri Houdesheldt told me. I contacted Occupational Health. We had a conversation regarding it. During that conversation or conversations [I learned] that we did not have any record or disclosure of the allergy to a medication.

. . . .

Q: [D]o you recall having a discussion with Wendy Sullivan or anyone else in Occupational Health that said, in essence, "This allergy history regarding medication was not disclosed at the time of hire and could be a falsification issue/grounds for termination?". . . .

A: Yes.

. . . .

Q: .... Did you just take Occupational Health's representation to you as true, that this medication allergy was not disclosed by Ms. Schoonover at the time of her hire?

A: That is correct.

. . . .

Q: [H]ow did you know that Ms. Schoonover didn't tell someone at some point during the [hiring] process about this medication allergy?

A: From our Occupational Health Department, who keeps those medical

records an the history of our driver associates.

Morse Dep. 9:19–22:2. After this investigation, on August 20, 2003, Morse decided to terminate Schoonover's employment because he believed she submitted false or incomplete medical materials. Morse Dep. 7:16–24, 23:14–19, 24:19–23; *see also* Def. App. 37 (Occupational Health Department notes explaining why Schoonover was to be terminated), 71 (Morse's notes detailing reasons for Schoonover's termination); 89 (termination notice signed by Morse and Williams explaining why Schoonover was terminated).[21] Morse notes Sullivan recommended termination. Morse testified that if he believed termination was not the correct course, he would not have fired Schoonover.

Schneider claims neither Houdesheldt nor Williams mentioned their early August meeting with Schoonover where she inquired into whether her route and equipment assignments were made on the basis of her sex. Morse testified as follows:

Q: .... Did you talk to Marla Williams about the decision to terminate [Schoonover]'s employment?

A: No.

Q: Did either Marla Williams or Sheri Houdesheldt inform you that they had a meeting, either/or both of them, that they had a meeting with Deb Schoonover about concerns Deb had about loads, tractor assignments, pay, that sort of thing?

A: I don't remember.

Q: Did you ever hear from [Houdesheldt] or [Williams] that [Schoonover] had complained to either or both of them that she felt she was being discriminated against based on her gender in tractor assignments, loads, pay?

A: No.

Morse Dep. 51:25–52:13. Specifically, the record shows neither Houdesheldt nor Williams advised, consulted, or had any input into the decision to end Schoonover's employment, and the record is silent as to any indication to the contrary. Schoonover concedes Houdesheldt had no involvement with her firing but argues Williams was part of the decisionmaking process because she signed (along with Morse) a form known as a Driver/Power Term Sheet, which listed the reasons for Schoonover's termination. Morse signed the document on August 20, 2003; Williams' signature is next to an illegible date. Schoonover wishes the Court to infer Williams' signature means Williams and Morse conferred before Morse decided to discharge Schoonover, and Schoonover's inquiry into discrimination voiced in early August must have been discussed. Schneider argues the most that can be inferred from Williams' signature is that at some point after the decision to fire Schoonover was made, Williams signed a form prepared by her subordinate.

---

**21.** The Court recognizes Schoonover testified that after August 13 but before her termination, she provided Morse medical documents showing she had disclosed her allergies to the physician who prepared the Medical Examination Report. Schoonover's provision of these documents to Morse is not helpful. Initially, even if a Schneider employee possessed some forms disclosing a complete and accurate medical history, that does not prevent the company from using false or incomplete statements in other forms to make employment decisions. Such a decision may not be wise or essentially fair, but it would not alone demonstrate unlawful discrimination. Additionally, Morse relied almost exclusively on the investigation performed by the Occupational Health Department when he decided to terminate Schoonover's employment. Even if Morse considered the documents Schoonover allegedly provided, there is a lack of evidence showing Morse's decision to believe the Occupational Health Department was discriminatory.

Schneider also points to Williams' deposition, where she testified she had no role in the decision to fire Schoonover:

Q: Did you have any input into the decision to fire Deb Schoonover?

A: No.

Q: Do you know who did?

A: Jeff Morse.

Q: Did Mr. Morse talk to you about his decision prior to announcing it to Ms. Schoonover? A: No.

. . . .

Q: Prior to Ms. Schoonover being fired, had you [had] any discussions with Ms. Schoonover about concerns or complaints she had about her employment?

A: No, not that I recall.

Q: Had you heard from Mr. Morse or Ms. Houdesheldt about any concerns or complaints expressed to them by Ms. Schoonover?

A: No, not that I recall.

Williams Dep. 4:16–5:10. Further, Schneider notes it is standard procedure for a Service Team Leader to terminate a driver's employment without consulting his superiors, implying Morse would have gone outside established protocols had he and Williams discussed Schoonover's termination before the decision to fire her was made.

Morse did not recall hearing about the meeting between Williams, Houdesheldt, and Schoonover before making his decision to fire Schoonover. Regardless of whether he heard about the fact that a meeting occurred, the record shows he was unaware of the meeting's substance: Morse testified that he did not "hear from [Houdesheldt] or [Williams] that [Schoonover] had complained to either or both of them that she felt she was being discriminated

against based on her gender in tractor assignments, loads, [or] pay." Morse Dep. 52:9–13. The record contains no evidence from which to infer the contrary.

## II. Procedural History.

Schoonover filed a timely complaint with the Iowa Civil Rights Commission ("ICRC"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC"). The EEOC returned administrative releases and right to sue letters on November 8 and November 15, 2005, and the ICRC provided Schoonover with a right to sue letter on February 10, 2006. Schoonover commenced this action on February 1, 2006, amending her Complaint after receiving her ICRC administrative release.

In Count I of her Amended Complaint, Schoonover alleges she was terminated based on her gender, constituting a violation of section 703(a)(1) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a)(1) (2006). Count V sets forth similar allegations but is brought under section 7 of the Iowa Civil Rights Act of 1965, as amended, Iowa Code § 216.6(1)(a) (2006). In Count II, Schoonover alleges she was terminated in retaliation for complaining about disparate treatment she received, constituting a violation of section 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a). And in Count VI, Schoonover brings similar complaints under section 8 of the Iowa Civil Rights Act, as amended, Iowa Code § 216.11(2). Schneider has moved for summary judgment on all four counts.[22]

## DISCUSSION

### I. Summary Judgment Standards.

Federal Rule of Civil Procedure 56 permits parties against whom claims are

---

**22.** Schoonover voluntarily dismissed Counts III, IV, and VII on February 22, 2007. Of course, dismissal of those counts has no effect on the validity of the remaining ones.

brought to move for summary judgment. Fed.R.Civ.P. 56(b). That rule provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* R. 56(c). " 'When the moving party has carried [this] burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Scott v. Harris,* ─── U.S. ───, ───, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted and alteration by the Scott Court)). In other words, " 'the mere existence of some alleged factual dispute between the parties will not defeat' " a properly supported motion for summary judgment; instead, there must be " 'no *genuine* issue of *material* fact.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphases by the *Anderson* Court)).

Where there are competing narratives, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* Instead, it takes two or more sides of a factual dispute each supported by evidence to metamorphose a generic factual dispute into a "genuine" one. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (to reject a motion for summary judgment, "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party"), 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.")

(citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' "). That is, demonstrating only "some metaphysical doubt as to the material facts" is not sufficient. *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348; *see also Crawford–El v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (in the face of a properly supported motion, requiring a nonmoving party to "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of pro[of]"); *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (if evidence supporting a claim "is merely colorable or is not significantly probative, summary judgment may be granted") (citing *Cities Serv.,* 391 U.S. at 290, 88 S.Ct. 1575; *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (per curiam)).

Of course, locating a genuine factual dispute capable of resolution in favor of the nonmoving party does not compel denial of summary judgment: The dispute must be about a fact that is material. A genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (when deciding if a material factual dispute exists, a court must "view[ ] the evidence through the prism of the controlling legal standard"). Conversely, genuine disputes about "irrelevant or unnecessary" facts are not sufficient to avoid summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Procedurally, the party seeking summary judgment must acquaint the Court

with the basis for its motion by highlighting portions of the record featuring the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The resisting party must then go beyond the pleadings and present " 'specific facts showing that there is a genuine issue for trial.' " *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505 (quoting Fed.R.Civ.P. 56(e)); *accord Dep't of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 329, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) ("To prevail on a . . . motion for summary judgment—as opposed to a motion to dismiss— . . . mere allegations . . . are insufficient."); *Behrens v. Pelletier,* 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (holding that when considering a motion for summary judgment, "the plaintiff can no longer rest on the pleadings and the court looks to the evidence before it (in the light most favorable to the plaintiff)" (citation omitted)); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that "[i]n, . . . response to a summary judgment motion . . . [a] plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' ") (quoting Fed.R.Civ.P. 56(e)); *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 (a properly supported motion must be resisted by a party's "own affidavits, or by the depositions, answers to interrogatories, and admissions on file" which "designate specific facts showing that there is a genuine issue for trial" (quotation marks omitted)). If a party bears the burden of proof at trial, summary judgment is appropriate against that party if it "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *accord Nebraska v. Wyoming,* 507 U.S. at 590, 113 S.Ct. 1689; *Lujan v. Nat'l Wildlife Feder.,* 497 U.S.

871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). There is no burden upon "the moving party to *negate* the elements of the nonmoving party's case;" instead, it is inherent upon the nonmoving party to designate specific facts demonstrating the need for a trial. *Nat'l Wildlife Feder.,* 497 U.S. at 885, 110 S.Ct. 3177. If the nonmoving party fails, "[t]he moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *accord Nat'l Wildlife Feder.,* 497 U.S. at 884, 110 S.Ct. 3177.

Throughout this process, the Court must view the record and reasonable inferences derivable from the record in a light favorable to the nonmoving party, *see Behrens,* 516 U.S. at 309, 116 S.Ct. 834; *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587–88, 106 S.Ct. 1348, presume the nonmoving party's version of a disputed issue is the correct one, *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 339, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *Hunt v. Cromartie,* 526 U.S. 541, 551, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Bragdon v. Abbott,* 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. 2130, while avoiding jury functions like making credibility determinations, weighing the evidence, and "drawing . . . legitimate inferences from the facts," *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *see also Cromartie,* 526 U.S. at 552, 119 S.Ct. 1545 (error to resolve disputed fact). But if after analyzing the record, " 'it is quite clear what the truth is,' " summary judg-

ment may be granted: While "'the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try,'" *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), summary judgment erects "the ultimate screen to weed out truly insubstantial lawsuits *prior* to trial," *Crawford–El*, 523 U.S. at 600, 118 S.Ct. 1584; *see also Celotex Corp.*, 477 U.S. at 323–24, 106 S.Ct. 2548 (stating that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and ... it should be interpreted in a way that allows it to accomplish this purpose"). *Cf. Clinton v. Jones*, 520 U.S. 681, 708, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (suggesting Rule 56 serves as a deterrent to the initiation of "frivolous and vexatious litigation").

■■■ The Eighth Circuit has recently and repeatedly cautioned that "summary judgment should be used sparingly in the context of employment discrimination and/or retaliation cases where direct evidence of intent is often difficult or impossible to obtain." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1117–18 (8th Cir.2006) (citing *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1034–35 (8th Cir.2005)); *accord Higgins v. Gonzales*, 481 F.3d 578, 584 (8th Cir.2007) ("'seldom ... used'" (quoting *Stidham v. Minn. Mining & Mfg., Inc.*, 399 F.3d 935, 937 (8th Cir. 2005))); *Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC*, 471 F.3d 843, 845–46 (8th Cir.2006) ("'used sparingly'" (quoting *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir.2000))); *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 873 (8th Cir.2005) ("'seldom ... granted'" (quoting *Mayer v. Nextel West Corp.*, 318

F.3d 803, 806 (8th Cir.2003) (quotation marks omitted))); *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1006 (8th Cir.2005) ("'seldom ... used'" (quoting *Stidham*, 399 F.3d at 937)); *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850 (8th Cir.2005) ("'used sparingly'" (quoting *Whitley*, 221 F.3d at 1055)); *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir.1999) ("generally inappropriate"); *see also United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) (noting the difficulty in identifying intent because "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes."). However, employment discrimination and retaliation cases are not to be treated with delicacy: "No separate summary judgment standard exists for discrimination or retaliation cases." *DTG Operations, Inc.*, 442 F.3d at 1118; *see Berg*, 169 F.3d at 1144 (stating that "there is no 'discrimination case exception' to the application of [Rule] 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial"); *see also Aikens*, 460 U.S. at 716, 103 S.Ct. 1478 (indicating trial courts should not "treat discrimination differently from other ultimate questions of fact"). This pair of standards is reducible to the following: "Although Rule 56 contains only one standard, [this Court] must exercise *particular* caution when examining the factual question of intent to ensure that [it] dutifully extend[s] all justifiable inferences in favor of the non-moving party." *DTG Operations, Inc.*, 442 F.3d at 1118 (emphasis in the original).

Informed by these standards, the Court turns to the parties' arguments.

## II. Discrimination Claims.

The Court opens with Schoonover's gender discrimination claim.

## A. Legal Standards.

■ In relevant part, section 703 of the federal Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1)(2006). The Iowa Civil Rights Act of 1965, as amended, Iowa Code ch. 216 (2006), makes it an unlawful employment practice for a "[p]erson to refuse to hire, accept, register, classify, or refer for employment, to discharge any employee, or to otherwise discriminate in employment against ... any employee because of the ... sex ... of such ... employee, unless based upon the nature of the occupation," *Id.* § 216.6(1)(a).[23] Because Schoonover does not rely on direct evidence of discrimination,[24] the three-part

**23.** With some inapplicable exceptions, *see Vivian v. Madison,* 601 N.W.2d 872, 873–74 (Iowa 1999) (cataloging dissimilarities), claims brought under the implicated portions of the Iowa Civil Rights Act are analyzed by the same framework applied in cases advanced under the federal civil rights acts, *see Pecenka v. Fareway Stores, Inc.,* 672 N.W.2d 800, 803 (Iowa 2003) (noting adoption of framework used to analyze sex discrimination cases brought under the federal act to cases brought under the state act); *Bearshield v. John Morrell & Co.,* 570 N.W.2d 915, 918 (Iowa 1997) (same for disability discrimination cases); *Hulme v. Barrett,* 449 N.W.2d 629, 631–32 (Iowa 1989) (same for age discrimination cases); *Woodbury County v. Iowa Civil Rights Comm'n,* 335 N.W.2d 161, 165 (Iowa 1983) (same for race discrimination cases); *King v. Iowa Civil Rights Comm'n,* 334 N.W.2d 598, 601 (Iowa 1983) (same for religious discrimination cases); *Linn Coop. Oil Co. v. Quigley,* 305 N.W.2d 729, 733 (Iowa 1981) (same for sex discrimination cases); *see also Vivian,* 601 N.W.2d at 873 (collecting cases tracing genesis and evolution of symmetry in state and federal frameworks); *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n,* 322 N.W.2d 293, 296 (Iowa 1982) (same). The Supreme Court of Iowa has further clarified that while federal cases interpreting federal statutes guide claims brought under state law, courts analyzing the latter are not to substitute "the language of the federal statutes for the clear words of the Iowa Civil Rights Act." *Hulme,* 449 N.W.2d at 631; *see also Pecenka,* 672 N.W.2d at 803 ("Iowa courts ... are not bound by federal law, despite consistent utilization of the federal analytical framework."); *Vivian,* 601 N.W.2d at 873 ("Federal law ... is not controlling."); *Bd. of Supervisors of Buchanan County v. Iowa Civil Rights Comm'n,* 584 N.W.2d 252, 255 (Iowa 1998) ("Federal cases provide guidance only to the extent that the statutory scheme they are interpreting and applying resembles [Iowa's] civil rights legislation."). Here, because the relevant language is nearly identical in both statutes, *compare* 42 U.S.C. § 2000e–2(a)(1) (prohibiting discrimination "because of [an] individual's ... sex") with Iowa Code § 216.6(1)(a) (prohibiting discrimination "because of the ... sex ... of [an] ... employee"), the following analysis simultaneously addresses Schoonover's state and federal discrimination claims.

**24.** "Direct evidence" is " 'evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.' " *Fjelsta v. Zogg Dermatology, PLC,* 488 F.3d 804, 809, 2007 WL 1531237, at *3 (8th Cir.2007) (quoting *Griffith v. City of Des Moines,* 387 F.3d 733, 736 (8th Cir.2004)); *accord Thomas v. First Nat'l Bank of Wynne,* 111 F.3d 64, 66 (8th Cir.1997). " '[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Griffith,* 387 F.3d at 736. In sex discrimination cases, direct evidence "might include proof of an admission that gender was the reason for an action, discriminatory references to the particular employee in a work context, or stated hostility to women being in the workplace at all." *Kerns v. Capital Graphics, Inc.,* 178 F.3d 1011, 1017 (8th Cir.1999) (collecting authorities). While cases where this evidence is present are few and far between, they do exist. *E.g., Simmons v. New Pub. Sch. Dist. No. Eight,* 251 F.3d 1210, 1214 (8th Cir.2001) (comments by decisionmaker that "a woman can't handle [the female plaintiff]'s job" and that the plaintiff was "a woman in a man's

burden-shifting framework devised by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to Schoonover's sex discrimination claim. Under that test, a plaintiff carries the "initial burden" of setting forth a *prima facie* case of unlawful discrimination.[25] *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the record contains such evidence, the employee is entitled to "a rebuttable 'presumption that the employer unlawfully discriminated against'" her. *Aikens*, 460 U.S. at 714, 103 S.Ct. 1478 (quoting *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089). A burden of production then arises upon the employer "to articulate some legitimate, nondiscriminatory reason for" the employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *accord Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *Burdine*, 450 U.S. at 253–54, 101 S.Ct. 1089. If the record contains such evidence, the employee must then "be afforded a fair opportunity to show that [the employer]'s stated reason for [the adverse employment action] was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817; *accord Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *see also McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. 1817 (the employee must be given an opportunity to show "the presumptively valid reasons for [the adverse employment action] were in fact a coverup for a ... discriminatory reason").

job" was direct evidence of discrimination based on sex (quotation marks omitted)). Cf. *Green v. Dillard's, Inc.*, 483 F.3d 533, 540 (8th Cir.2007) (noting in dicta that use of the word "nigger[ ] is direct evidence of discrimination"); *EEOC v. Liberal R–II Sch. Dist.*, 314 F.3d 920, 924–25 (8th Cir.2002) (decisionmaker's belief that a 70–year–old employee "was too old to drive a bus" was direct evidence of discrimination based on age); *Kneibert v. Thomson Newspapers, Mich. Inc.*, 129 F.3d 444, 452 (8th Cir.1997) (evidence that a decisionmaker terminated an employee because he "had no use for a senior editor" but needed "three young editors" was direct evidence of discrimination based on age); *Williams v. Valentec Kisco, Inc.*, 964, F.2d 723, 728 (8th Cir.1992) (where disciplinary report-signing individual asked plaintiff's supervisor, in reference to the plaintiff, what he was doing "with an old man carrying the boxes anyway?," direct evidence of discrimination based on age existed). The closest thing to direct evidence in this record is Houdesheldt's statement that Schoonover was overly sensitive about safety issues because she was female. However, because Houdesheldt was not a decisionmaker with respect to any of Schoonover's proposed adverse employment actions, the Court concludes this is an inactionable stray comment. *See Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1056–57 (8th Cir.2007) (comments by coworkers which were not endorsed by decisionmakers constitute inactionable stray comments); *Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 867–68 (8th Cir.2003) (discounting potentially discriminatory comments made by nondecisionmakers); *Rivers–Frison v. Southeast Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir.1998) (comments by nondecisionmakers cannot constitute direct evidence of discrimination).

25. "The phrase 'prima facie case' not only may denote the establishment of a legally mandatory, rebuttable presumption, but also may be used by courts to decide the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1980). Of course, in the Title VII context, the former is intended. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). (analogizing Federal Rule of Evidence 301 to the *McDonnell Douglas* framework).

■ Throughout this process, the burden of *persuasion* remains with the Plaintiff. *Burdine,* 450 U.S. at 248, 101 S.Ct. 1089 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (citing *Bd. of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978)); [26] *accord Reeves,* 530 U.S. at 143, 120 S.Ct. 2097; *Hicks,* 509 U.S. at 507, 517–18, 113 S.Ct. 2742. The burden of *production* carried by the employer in the intermediate stage "is intended progressively to sharpen the inquiry to the elusive factual question of intentional discrimination," *Burdine,* 450 U.S. at 255 n. 8, 101 S.Ct. 1089; *see also Id.* at 255–56, 101 S.Ct. 1089 (placing a burden of production on the employer "serves simultaneously to meet the plaintiff's *prima facie* case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext"), but does not give rise to a burden of persuasion on the part of the employer.

The Court is aware that "[t]he *prima facie* case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic,'" and is instead "'merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Aikens,* 460 U.S. at 711, 103 S.Ct. 1478 (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). Flexible as it may be, the three-part framework is mandatory.

More importantly, perhaps, the Court is guided by "'[t]he broad, overriding interest, shared by employer, employee, and consumer[:] efficient and trustworthy workmanship assured through fair and ... neutral employment and personnel decisions.'" *Burdine,* 450 U.S. at 259, 101 S.Ct. 1089 (quoting *McDonnell Douglas,* 411 U.S. at 801, 93 S.Ct. 1817) (alteration by the *Burdine* Court). Title VII was not intended to create a rule whereby preferential treatment is given to minorities or women by "requir[ing] the employer to restructure his employment practices to maximize . the number of minorities and women hired." *Burdine,* 450 U.S. at 259, 101 S.Ct. 1089 (citing *Furnco Constr. Corp.,* 438 U.S. at 577–78, 98 S.Ct. 2943); *see also* 42 U.S.C. § 2000e–2(j) ("Nothing contained in this subchapter shall be interpreted to require any employer ... to grant preferential treatment to any individual ... because of the race, color, religion, sex, or national origin of such individual"). The statute does not supplant "'traditional management prerogatives.'" *Burdine,* 450 U.S. at 259, 101 S.Ct. 1089 (quoting *Steelworkers v. Weber,* 443 U.S. 193, 207, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979)). As a result, this Court cannot and will not serve as a conduit through which an employee wishes to protest the reasons for her firing, except to the extent the employer's practices exhibit some species of prohibited discrimination. Aptly put,

[An employee's] evidence must do more than merely raise doubts about the wisdom and fairness of the opinions of [the employee] held by [the employee's] superiors and [the employee's] fellow em-

**26.** The Court later clarified that "pretext" in this context is shorthand for "pretext for discrimination." *See Hicks,* 509 U.S. at 516, 113 S.Ct. 2742. This elucidation had the immediate impact of rendering the quoted sentence informative as to the "form rather than the substance of the defendant's production burden;" that is, requiring the defendant to clearly set forth its reasons for the employment action allows the plaintiff the opportunity to show that the proffered reasons are false. *Id.*

ployees. It must create a real issue as to the genuineness of those perceptions. Title VII does not prohibit employment decisions based upon ... erroneous evaluations. Employers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices. Federal courts do not sit as super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.

*Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685–86 (8th Cir.2002) (citations and quotation marks omitted; omission in the original).

### B. Analysis.

The Court begins by assessing Schoonover's *prima facie* case.

### 1. Schoonover's *Prima Facie* Case.

The Supreme Court has explained that while "[t]he burden of establishing a *prima facie* case of disparate treatment is not onerous," it serves an important function by "eliminat[ing] the most common nondiscriminatory reasons for" adverse employment actions. *Burdine*, 450 U.S. at 253–54, 101 S.Ct. 1089. *Cf. Hicks*, 509 U.S. at 515, 113 S.Ct. 2742 ("Quite obviously ... what is required to establish the *McDonnell Douglas prima facie* case is infinitely less than what a directed verdict demands.").

As noted above, if a plaintiff generates a fact question on each element of her *prima facie* case, a presumption of discrimination automatically arises. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *accord* Hicks, 509 U.S. at 506, 113 S.Ct. 2742. Such an inference is appropriate because "establishing" a *prima facie* case 'raises an inference of discrimination only because ... [the em-

ployer's actions], if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089 (quoting *Furnco Constr. Corp.*, 438 U.S. at 577, 98 S.Ct. 2943).

 The elements of a plaintiff's *prima facie* case when bringing a Title VII sex discrimination claim are well established. A plaintiff must "show she (1) was a member of a protected class, (2) was qualified to do her job, (3) suffered an adverse employment action, and (4) was treated differently from similarly-situated male employees." *Thomas v. Corwin*, 483 F.3d 516, 529–30 (8th Cir.2007); *accord Holland v. Sam's Club*, 487 F.3d 641, 644, 2007 WL 1518481, at *2 (8th Cir.2007); *Wells v. SCI Mgmt. L.P.*, 469 F.3d 697, 700 (8th Cir.2006); *Wittenburg v. Am. Express Fin. Advisors, Inc.*, 464 F.3d 831, 836 n. 8 (8th Cir.2006); *Tenge v. Phillips Modern Ag. Co.*, 446 F.3d 903, 910 (8th Cir.2006); *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir.2005); *Hesse v. Avis Rent A Car Sys.*, 394 F.3d 624, 631 (8th Cir.2005); *Simmons v. New Public Sch. Dist. No. Eight*, 251 F.3d 1210, 1214 (8th Cir.2001); *LaCroix v. Sears, Roebuck, & Co.*, 240 F.3d 688, 693 (8th Cir.2001); *Schoffstall v. Henderson*, 223 F.3d 818, 825 (8th Cir.2000); *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir.1999); *Hill v. St. Louis Univ.*, 123 F.3d 1114, 1119 (8th Cir.1997). Because the parties agree the first and second elements have been satisfied, the Court begins with the third.

### a. Adverse Employment Action.

Schneider concedes Schoonover's termination was an adverse employment action. Of debate, however, is whether her assignments to drive faulty trucks on routes largely east of Des Moines also amount to adverse employment actions.

### i. Legal Standards.

■ An adverse employment action is " 'a tangible change in working conditions that produces a material employment disadvantage.' " *Wedow v. City of Kansas City,* 442 F.3d 661, 671 (8th Cir.2006) (quoting *Sallis v. Univ. of Minn.,* 408 F.3d 470, 476 (8th Cir.2005)); *accord Holland,* 487 F.3d 641, 644–45, 2007 WL 1518481, at *2; *Higgins,* 481 F.3d at 584; *Reynolds v. Ethicon–Endo–Surgery, Inc.,* 454 F.3d 868, 872 (8th Cir.2006); *Cruzan v. Special Sch. Dist. # 1,* 294 F.3d 981, 984 (8th Cir.2002); *Cooney v. Union P. R.R. Co.,* 258 F.3d 731, 734 (8th Cir.2001); *Spears v. Mo. Dep't of Corrs. & Human Res.,* 210 F.3d 850, 853 (8th Cir.2000); *see also Enowmbitang v. Seagate Tech., Inc.,* 148 F.3d 970, 973 (8th Cir.1998) (requiring conduct to "materially alter[ ] the terms or conditions of the plaintiff's employment" to constitute an adverse employment action); *Ledergerber v. Stangler,* 122 F.3d 1142, 1144–45 (8th Cir.1997) (same). Some employment actions, such as " 'changes in the terms, duties, or working conditions that cause no materially significant disadvantage to the employee ... or disappointment with changes in one's employment situation,' " are simply not adverse. *Saulsberry v. St. Mary's Univ. of Minn.,* 318 F.3d 862, 868 (8th Cir.2003) (quoting *Sowell v. Alumina Ceramics, Inc.,* 251 F.3d 678, 684 (8th Cir.2001)); *see also Higgins,* 481 F.3d at 584 ("Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy this prong."). Even if an employee is forced to change positions, resulting in an " 'alteration of job responsibilities,' " the employee must still show a significant change in employment status. *Box v. Principi,* 442 F.3d 692, 696 (8th Cir.2006) (quoting *Wenzel v. Missouri–American Water Co.,* 404 F.3d 1038, 1042 (8th Cir. 2005)); *see Ledbetter v. Alltel Corporate Servs., Inc.,* 437 F.3d 717, 724 (8th Cir. 2006) (adverse employment actions "include[ ] decisions such as failing to promote, or reassigning an employee to a position with significantly different responsibilities"). In contrast, examples of material employment disadvantages include " ' "[t]ermination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects." ' " *Okruhlik v. Univ. of Ark.,* 395 F.3d 872, 879 (8th Cir.2005) (quoting *Duncan v. Delta Consol. Indus.,* 371 F.3d 1020, 1026 (8th Cir.2004), in turn quoting *Spears,* 210 F.3d at 853); *accord Box,* 442 F.3d at 696; *Sallis,* 408 F.3d at 476; *Cooney,* 258 F.3d at 734; *LaCroix,* 240 F.3d at 691; *Spears,* 210 F.3d at 853; *Kerns v. Capital Graphics, Inc.,* 178 F.3d 1011, 1016–17 (8th Cir.1999). A " '[m]ere inconvenience without any decrease in title, salary, or benefits' or that results in minor changes in working conditions does not meet this standard." *Wedow,* 442 F.3d at 671 (quoting *Sallis,* 408 F.3d at 476); *accord Cruzan,* 294 F.3d at 984; *see also Powell v. Yellow Book USA, Inc.,* 445 F.3d 1074, 1079 (8th Cir.2006) (noting that "[n]ot every setback amounts to an adverse employment action: instead, an action must give rise to 'a material employment disadvantage' that reflects a 'tangible change in duties or working conditions' ") (quoting *Baucom v. Holiday Cos.,* 428 F.3d 764, 767 (8th Cir.2005)).

Requiring the action complained of to reach a certain threshold is a sensible rule because " '[o]therwise, minor and even trivial employment actions that "an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." ' " *Greaser v. Mo. Dep't of Corr.,* 145 F.3d 979, 984 (8th Cir.1998) (quoting *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996), in turn quoting *Williams v.*

*Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996)).

■ Predictably, the circumstances amounting to an adverse employment action are diverse and dependent on the facts analyzed. *Compare Holland,* 487 F.3d 641, 644–45, 2007 WL 1518481, at *2 (transfer to a different job with no change in benefits and only a minor change in working conditions did not constitute an adverse employment action); *Elnashar v. Speedway SuperAmerica LLC,* 484 F.3d 1046, 1056 (8th Cir.2007) (same); *Corwin,* 483 F.3d at 530 ("satisfactory" rating did not amount to an adverse employment action); *Higgins,* 481 F.3d at 584–88 (job reassignment involving no reduction in salary, benefits, or prestige; denial of supervision, mentoring, and training; alleged creation of a "shadow file" and "whisper campaign" by a superior; vague complaints by a superior; failure to perform a mid-year evaluation; recommendation of termination; and transfer to a different office neither individually nor aggregated amounted to an adverse employment action); *Reynolds,* 454 F.3d at 872 (plaintiff's rejection of lateral transfer with same pay, title, and advancement opportunities was not an adverse employment action); *Box,* 442 F.3d at 696 (plaintiff who refused transfer and was assigned to a temporary position with similar job responsibilities with the same pay did not suffer an adverse employment action); *Davis v. KARK–TV, Inc.,* 421 F.3d 699, 707 (8th Cir.2005) (elimination of plaintiff's position followed by transfer to a higher-level position accompanied by a raise was not an adverse employment action); *Zhuang v. Datacard Corp.,* 414 F.3d 849, 854–55 (8th Cir.2005) (transfer to a different position, even if forced, without reduction in pay or benefits is not an adverse employment action); *Cruzan,* 294 F.3d at 983–84 (forcing female teacher to either share a staff rest-room with a trans-gender individual during his transition from one biological gender to the other or use a student or unisex restroom was not an adverse employment action); *LaCroix,* 240 F.3d at 691–93 (mediocre performance review and memorandum of deficiency did not constitute adverse employment actions); *Schoffstall,* 223 F.3d at 825–26 (requiring an employee to provide documentation of an injury, placing an employee on light duty status, mandating a fitness-for-duty examination, and placing an employee on administrative leave while her disability status is clarified are not adverse employment actions); *Spears,* 210 F.3d at 853–54 (transfer accompanied by minor changes in working conditions with no corresponding impact on title, salary, benefits, or other material aspect of employment even when coupled with a lower performance rating did not amount to an adverse employment action); *Breeding,* 164 F.3d at 1157 (criticizing an employee for work deficiencies does not amount to an adverse employment action), *Enowmbi-tang,* 148 F.3d at 973–74 (failure of employer to provide employee with a specific piece of business equipment, even when viewed together with negative evaluation insufficient to amount to an adverse employment action), *with Elnashar,* 484 F.3d at 1056 (reclassification from manager trainee to assistant manager trainee, coupled with reduction in hours amounted to an adverse employment action); *Wedow,* 442 F.3d at 671–72 ("being required to work as a firefighter with inadequate protective clothing and inadequate restroom and shower facilities" is an adverse employment action); *Ledbetter,* 437 F.3d at 724 (upholding finding of an adverse employment action where plaintiff took on additional responsibilities without additional pay); *Turner,* 421 F.3d at 697 (even though initiation of new professional connections after a job transfer is a normal inconvenience employees must endure fol-

lowing a job transfer, plaintiff presented evidence that the transfer also resulted in a considerable downward shift in job responsibilities, giving rise to a fact issue on whether an adverse employment action occurred); *Okruhlik*, 395 F.3d at 878–80 (denial of tenure to a university professor can be an adverse employment action, but withdrawal from tenure-seeking procedures operates to extinguish any potential claim); *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 928–29 (8th Cir.2004) (employee who resigned in the face of pending transfer to an inferior job can still claim occurrence of an adverse employment action); *Meyers v. Neb. Health & Human Servs.*, 324 F.3d 655, 659–60 (8th Cir.2003) (even though pay and benefits remained stable, reassignment to a job requiring "a considerable downward shift in skill level" fused with a reduced workload held sufficient to generate a fact question regarding whether an adverse employment action occurred); *Phillips v. Collings*, 256 F.3d 843, 846–49 (8th Cir.2001) (document drafted by supervisor which extensively criticized plaintiff's performance and recommended a "Corrective Action Plan" and remedial training amounted to an adverse employment action because the supervisor lacked termination authority but did everything possible to disrupt employment); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir.1997) (plaintiff stripped of desirable duties, given lower performance evaluations, warned about his demeanor, placed under surveillance, excluded from work meetings, issued reprimands for alleged race-based incidents, and required to attend special training experienced an adverse employment action); *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1266 (8th Cir. 1997) (negative references to potential future employers can be adverse employment actions). Distilling these authorities reveals satisfaction of two elements are required to show the occurrence of an adverse employment action: there must be a change in the employee's working conditions and that change must precede and result in some kind of material employment disadvantage.

#### ii. Analysis.

Aside from her termination, Schoonover identifies a brace of potential adverse employment actions. First, Schoonover claims she suffered an adverse employment action by being repeatedly assigned to different trucks. She argues that each time she was assigned, she was forced to spend time preparing and cleaning the new truck and waiting for her next load assignment. She also contends the equipment to which she was assigned continually experienced mechanical problems, resulting in large swaths of downtime. Incontestably, while Schoonover was cleaning and waiting, she was not driving and earning money. Because mileage is money, she claims, repeated reassignments led to decreased wages.

Second, Schoonover claims she suffered an adverse employment action as a result of her route assignments. Of the approximately fifty destinations Schoonover visited, she claims only fourteen were south or west of Des Moines. According to Schoonover, it took her more time to traverse the same distance on trips headed east of Des Moines compared to west of Des Moines. At oral argument, Schoonover suggested the reason for such a disparity rests with differences in terrain and traffic patterns. Because a driver's wages are directly proportional to the distance they drive, the ability to cover large distances quickly is a key facet of earning money. Schoonover adds that on at least two occasions, she was pulled from profitable westbound jobs and reassigned to less profitable jobs headed east.

Schneider does not directly respond to the argument that Schoonover's equipment assignments adversely impacted her salary in a material way. With respect to route assignments, Schneider counters by noting that Morse and Gonnerman—both armed with personal knowledge of the way work assignments are made and how compensation is structured for drivers based in the Des Moines Operating Center—testified that no material advantage arose for drivers assigned to deliver cargo to or retrieve cargo from a particular region. When compared to Schoonover's opinion testimony, which Schneider claims is based on speculation, Schneider argues no fact question remains with respect to whether Schoonover was actually disadvantaged by her route assignments.

■ The Court concludes a genuine issue of material fact has been generated that the act of repeatedly transferring vehicles amounts to an adverse employment action. Schoonover's transfers are analogous to the more common job transfer from one position to another. Such transfers typically do not amount to adverse employment actions unless accompanied by a reduction in pay, change in title or benefits, or assignment to significantly different job responsibilities. *See, e.g., Elnashar*, 484 F.3d at 1056; *Higgins*, 481 F.3d at 585; *Box*, 442 F.3d at 696; *Ledbetter*, 437 F.3d at 724; *Turner*, 421 F.3d at 697; *Zhuang*, 414 F.3d at 854–55; *Ledergerber*, 122 F.3d at 1144. Here, each time Schoonover swapped vehicles, neither her title nor benefits changed. The job she performed remained the same; she merely performed it in a different vehicle. However, each time a vehicle change was required, she was forced to prepare the new vehicle for travel. In a business where mileage is money, downtime directly decreased her pay. While switching trucks is arguably just a normal inconvenience

common to all truck drivers, forcing an employee to absorb the financial loss incurred from the switch places her at a disadvantage compared to drivers who switch trucks less frequently. Further, because vehicle assignments are based, in part, on a driver's ability to accumulate driving experience, frequent transfers with accompanying idle time could materially affect a driver's long-term ability to be assigned better vehicles, thus affecting her long-term pay and career advancement prospects.

Of course, Schoonover may have simply been unlucky. Addressing that issue at this phase of the *McDonnell Douglas* test, however, would be inappropriate: The goal at this point is to scour the record in search of fact questions regarding whether Schoonover's assignment to different vehicles was an adverse employment action. The Court concludes such questions exist.

■ Schneider's route assignments present in a more difficult posture for Schoonover. Schoonover claims she was forced to drive east more frequently than the average driver, which resulted in less pay. Burdening this argument, however, is a lack of evidence showing Schoonover was placed at a disadvantage compared to other drivers. In fact, there is evidence to the contrary. Declarations by those familiar with Schneider's route assignment policies indicate Schoonover's routes were not unusual, suggesting most of Schneider's work occurred east of Des Moines. Clearly, not every worker can have the most desirable assignments.

Speculation would engine any conclusion that Schoonover was placed at any disadvantage as a result of her route assignments. The Court concludes Schoonover has not generated a genuine issue of material fact with respect to whether Schoonover was placed at a disadvantage by her route assignments.

### b. Evidence of Causation.

### i. Legal Standards.

 Next, Schoonover must demonstrate fact questions exist with respect to whether the adverse employment actions identified occurred under circumstances suggesting discrimination. At this point, it is necessary for a plaintiff to produce "concrete evidence" of disparate treatment. *Corwin*, 483 F.3d at 530. A plaintiff's "conclusory ... [,] skeletal allegations, unsupported with specific facts or evidence, are insufficient to create a genuine issue of fact so as to preclude granting summary judgment." *Id.*

 One way a plaintiff can show a causal connection between her sex and the identified adverse employment actions is to show similarly-situated male employees were treated more favorably. *Wells*, 469 F.3d at 700–01; *Tenge*, 446 F.3d at 910; *Turner*, 421 F.3d at 695; *Hesse*, 394 F.3d at 631–32. If a plaintiff chooses this method of proof, she must show she and her comparators are " 'similarly situated in all respects.' " *Wells*, 469 F.3d at 701 (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir.2000)); *accord LaCroix*, 240 F.3d at 694. "This requires evidence that [the plaintiff] and her male co-workers 'were "involved in or accused of the same or similar conduct and [were] disciplined in different ways." ' " *Turner*, 421 F.3d at 695 (quoting *Rodgers*, 417 F.3d at 852, in turn quoting *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir.2004)); *accord Tenge*, 446 F.3d at 910. Relatedly, a plaintiff can also show "that 'other employees outside of the protected group were allegedly treated more favorably and were similarly situated in all relevant aspects.' " *In re Union P. R.R. Employment Practices Litig.*, 479 F.3d 936, 944 (8th Cir.2007).

 The fit between the plaintiff's position and her comparators' must be precise and the treatment the plaintiff received must be different from non-class occupiers. The test is "rigorous," *Ledbetter*, 437 F.3d at 723, but is not to be applied too narrowly, *Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484, 488 (8th Cir.1998) (holding that "requir[ing] that employees always have to engage in the exact same offense as a prerequisite for finding them similarly situated would result in a scenario where evidence of favorable treatment of an employee who has committed a different but more serious, perhaps even criminal offense, could never be relevant to prove discrimination"). Comparing analogous cases is an instructive exercise. *Compare Turner*, 421 F.3d at 695 (female plaintiff who habitually ignored workplace responsibilities not similarly situated to male co-workers who committed isolated mistakes); *Tenge*, 446 F.3d at 910–11 (female employee not similarly situated with male co-workers where female employee and male employees all engaged in sexual banter, but only female employee wrote explicit notes to the company's owner and engaged in consensual physical contact with owner); *LaCroix*, 240 F.3d at 694 (comparator in different department in a different position not similarly situated); *Bogren v. Minnesota*, 236 F.3d 399, 404–05 (8th Cir.2000) (employee in probationary period not similarly situated to employee not in probationary period); *Jones v. Frank*, 973 F.2d 673, 676 (8th Cir.1992) (female plaintiff dissimilarly situated from three male co-workers where, although all four were discharged for similar offenses, the males agreed to reinstatement in settlement of their EEO claims and plaintiff declined such an offer); *Maulding v. Sullivan*, 961 F.2d 694, 697–98 (8th Cir.1992) (female plaintiff who missed lab duties because of a medical condition not similarly situated to males whose absences were attributable to something other than a medical condition), with

*Peterson v. Scott County,* 406 F.3d 515, 522–23 (8th Cir.2005) (female plaintiff similarly situated with male applicants where each were recent hires and considered viable candidates); *Rodgers,* 417 F.3d at 852 (employees similarly situated where both violated the same company policy in the same way); *Ottman v. City of Independence, Mo.,* 341 F.3d 751, 757 (8th Cir. 2003) (candidates for a position are similarly situated where each meet the minimum job requirements); *Greer v. St. Louis Regional Med. Ctr.,* 258 F.3d 843, 846 (8th Cir.2001) (African–American female employee similarly situated to white employees who were compensated for work performed while off-duty, a benefit infrequently received by plaintiff); *Lynn,* 160 F.3d at 488 (plaintiff and co-worker similarly situated although the conduct engaged in by plaintiff's comparator was "at least comparable to, if not much more serious than" that engaged in by plaintiff). It is also necessary for the specimen employees to "have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *EEOC v. Kohler Co.,* 335 F.3d 766, 776 (8th Cir.2003) (citing *Lynn,* 160 F.3d at 487–88).

■ In addition to comparing members of the protected class to those outside the protected class, evidence that the plaintiff's duties were assumed by a male, *Wells,* 469 F.3d at 702, or that the plaintiff is one of a small number of females in a sea of males is relevant, but neither is dispositive. *Wittenburg,* 464 F.3d at 841; *Hesse,* 394 F.3d at 631–32. Comments by decisionmakers involved in the decision-making process are also probative. *See Wittenburg,* 464 F.3d at 841–42 (evaluating comments by plaintiff's co-workers, but ultimately finding no causal connection between comments and adverse employment action); *Simmons,* 251 F.3d at 1214 (comments by decisionmaker sufficient to prove fourth element and also to provide direct evidence of gender discrimination).

### ii. Analysis.

The method chosen by Schoonover is the comparison track: She claims she was treated differently from Schneider's male drivers with approximately the same experience. Principally, she claims male drivers were not provided faulty equipment and unprofitable routes. Secondarily, she claims the record contains evidence—although it is largely unidentified—suggesting she was terminated under circumstances giving rise to an inference of unlawful discrimination based on sex.

### (1) Equipment Assignments.

Beginning with equipment assignments, Schoonover understood when she joined Schneider that she, like all other new drivers, would not be assigned to the newest or best equipment. However, Schoonover claims she wasted time preparing multiple different trucks for use, resulting in a decrease in her pay. These reassignments were discriminatory, Schoonover argues, because males who had attended Schneider's training academy at the same time as she were not reassigned as many times. In fact, Schoonover alleges that when she saw and conversed with male drivers with similar driving experience, the male drivers typically drove the same truck from one encounter to the next. The only change Schoonover recalled was a male driver's shift from a cabover to a traditional cab. According to Schoonover, her own trainer found the reassignments unusual, and her own impression of the industry standard suggested she was being reassigned more frequently than was typical. Schoonover infers male drivers experienced fewer problems with their vehicles,

leading to less downtime and increased productivity.

Schneider opens with Schoonover's express admission that she believed none of her equipment assignments were motivated by a discriminatory animus. Recalling, Schoonover testified that she did not believe she was assigned to the initial cabover vehicle because she was a female. Further, Schneider notes Schoonover requested that type of truck when she was hired, and even if she did not, the assignment was not discriminatory because all newcomers—male and female alike—received that truck. The second truck she received cannot have been assigned to her as a result of discrimination because she received that style of truck at her request. Schoonover agreed that she was removed from that truck not because she was female, but because the truck was removed from service and dismantled. The argument that her separation from the third truck was discriminatory is based only on her own feeling that discrimination was afoot. That is insufficient.

Even viewing these occurrences in the aggregate, Schoonover was unable to identify a single Schneider employee she believes acted with discriminatory intent. As noted above, the best Schoonover could do is compile a list of reasons why her employment at Schneider was unpleasant and conclude she experienced those inconveniences because of her sex. Even viewed favorably to Schoonover, a specific fact connecting the two is lacking.

█ To the extent they are not hearsay,[27] comments by the trainer that the number of Schoonover's assignments was unusual is not evidence of discrimination because the individual voicing that concern was not a decisionmaker with respect to truck assignments. Additionally, the trainer did not say Schoonover received more reassignments than male employees; the trainer indicated Schoonover received more reassignments generally.

To the extent they are not hearsay, comments by Schoonover's male training classmates are largely unhelpful because Schoonover's recollection, the only record source of this information, is vague: She cannot remember the full names of any individuals she spoke with or when, specifically, her conversations with them occurred. In fact, the graduation of one male driver from a cabover to a conventional truck shows male drivers followed tracks trod by Schoonover. The Court also finds that Schoonover's conclusion that she was reassigned more frequently than is common in the industry according to trade publications lacks foundation because the source data for this opinion has not been provided for the Court's perusal.

The Court concludes that while Schoonover was assigned old equipment that experienced more mechanical problems than newer equipment, there is no evidence that Schoonover was assigned to drive this equipment on the basis of her gender. Instead, the record shows she was assigned aged trucks because she was new and inexperienced.

At bottom, while the record shows Schoonover may have been similarly situated to her male co-workers, the record

**27.** Even though the Supreme Court has noted that it does not require "the nonmoving party [to] produce evidence in a form that would be admissible at trial in order to avoid summary judgment," *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548, our circuit has determined that consideration of hearsay when deciding a motion for summary judgment is inappropriate, *see, e.g., Flowers v. City of Minneapolis*, 478 F.3d 869, 872 n. 1 (8th Cir.2007); *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir.2007); *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 930 n. 3 (8th Cir.2006); *Sallis*, 408 F.3d at 474.

does not generate an issue of material fact that she was treated less favorably. This conclusion is fatal to her discrimination claim insofar as it rests on equipment assignments.

### (2) Route Assignments.

The bulk the of the parties' arguments addressing the assignment of work focuses on allegations that a disproportionate number of Schoonover's assignments were to the east of Des Moines. Schneider first observes Schoonover has accumulated no data on other drivers' work assignments and therefore cannot say with certainty that she was assigned to go east more than other drivers, particularly male ones. Schneider then notes Gonnerman, who possesses personal knowledge of Schneider's work assignment procedures, avers that Schoonover's work assignments did not differ in any material way from any other worker.

With respect to the location of Schoonover's destinations, Schneider argues traveling east more frequently than west is not unusual because the bulk of the company's business is located there. In fact, Schneider notes, it would be unusual if Schoonover's routes took her west of Des Moines. Further, Schneider notes, the record is devoid of evidence suggesting any male coworker received more favorable routes.

In addition to being assigned to drive east of Des Moines, Schoonover contends she was pulled from at least two profitable west-bound trips and placed on east-bound trips. Schneider notes that the profitability of one load compared to another is supported only by Schoonover's speculative testimony. In any event, Schneider claims, Schoonover cannot prove west-bound loads were given to male workers.

On this record, the Court must conclude Schoonover has not pointed to evidence suggesting she was treated any differently than Schneider's male drivers. She has not, for example, produced a document showing Schneider pulled her from a profitable trip and replaced her with a male driver. Nor has she shown any male driver with similar experience and a similar driving record received any more assignments to the western United States than she did. Absent some type of evidence showing Schoonover was treated differently than male drivers with respect to work assignments, the Court simply cannot speculate that Schoonover received the route assignments she did because of her sex.

### (3) Termination.

Concluding with her termination, the record shows Schoonover disclosed she believed Morse did not do "things to [her] that were discriminatory because [she is] a woman" and did not "ha[ve] anything against [her] because [she is] a woman." In fact, of the persons Schoonover dealt with at the Des Moines Operating Center, Morse "tried to be the fairest of everyone."

Schoonover offers little to rebut these concessions. For example, she has not adduced evidence showing similarly-situated male drivers were not fired, or that someone other than Morse—such as Sullivan or Williams—was the decisionmaker with respect to her termination and one or both of those individuals acted with a prohibited state of mind.

Because Schoonover can point to no evidence connecting her discharge with facts giving rise to an inference of sex discrimination, there is no genuine issue of material fact on this record with respect to whether she was terminated because she is female.

### iii. Conclusion.

█ Schoonover has failed to show a causal connection between her claimed adverse employment actions and her sex.

## 2. Schneider's Proffered Legitimate, Nondiscriminatory Reason for its Adverse Employment Actions.

Assuming Schoonover generated a fact question on each element of her *prima facie* case, a burden of production arises for Schneider to proffer a legitimate and nondiscriminatory reason for each adverse employment action taken. The Court assumes, *arguendo*, that each of the three employment actions identified above are adverse.

### a. Legal Standards.

Proof on each element of a plaintiff's *prima facie* case generates a presumption of discrimination. The Supreme Court has explained that "[t]o establish a 'presumption' is to say that a finding of the predicate fact (here, the *prima facie* case) produces a required conclusion in the absence of explanation (here, the finding of unlawful discrimination)." *Hicks*, 509 U.S. at 506, 113 S.Ct. 2742 (quotation marks omitted). Extending an employer the opportunity to discharge the presumption of discrimination is the purpose of this stage of the analysis.

 The employer's burden "is to rebut the presumption of discrimination by producing evidence that the plaintiff [suffered an adverse employment action] for a legitimate, nondiscriminatory reason."

*Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *see McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817. It bears emphasis that this is a burden of production, only. *See Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 ("This burden is one of production, not persuasion...."); *Hicks*, 509 U.S. at 509, 113 S.Ct. 2742 (regardless of its persuasive value, production of evidence establishing nondiscriminatory reasons for the employment action satisfies burden of production); *Burdine*, 450 U.S. at 257, 101 S.Ct. 1089 (requiring a defendant to *persuade* the trier of fact instead of *produce* evidence is improper at this stage).[28] Because "the burden-of-production determination necessarily *precedes* the credibility-assessment stage," the Court may not evaluate the persuasiveness of the employer's explanation. *Hicks*, 509 U.S. at 509, 113 S.Ct. 2742; *accord Reeves*, 530 U.S. at 142, 120 S.Ct. 2097.

 Because of the low threshold applicable at this stage, it is unnecessary for an employer to *prove* "that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. For example, a defendant need not persuade a court that "it had convincing, objective reasons" for the actions taken. *See Burdine*, 450 U.S. at 257, 101 S.Ct. 1089 (reversing a court employing such a standard). Instead, "[i]t is sufficient if the

---

**28.** While it may seem unfair to afford a defendant such a low burden, the Supreme Court has set out a ternion of reasons explaining why "limiting the defendant's evidentiary obligations to a burden of production will [not] unduly hinder the plaintiff." *Burdine*, 450 U.S. at 258, 101 S.Ct. 1089. First, the defendant must provide a clear and reasonably specific explanation for the employment action in question. *Id.* Second, the defendant "retains an incentive to persuade the trier of fact that the employment decision was lawful," typically resulting in an attempt by the defendant to actually prove the factual basis for its explanation. *Id.; see also Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (noting that "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision," thus providing an incentive to employers to put forth as much evidence as possible). And "[t]hird, the liberal discovery rules applicable to any civil suit in federal court are supplemented in a Title VII suit by the plaintiff's access to the [EEOC]'s investigatory files concerning her complaint." *Burdine*, 450 U.S. at 258, 101 S.Ct. 1089.

defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff," *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089, by " 'set[ting] forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742 (quoting *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089) (emphasis deleted).[29]

### b. Analysis.

#### i. Assignment of Equipment.

▄▄ Beginning with the assignment of trucks, Schneider points to the Van Tractor Assignment Policy used by the Tractor Network Center to assign vehicles. As detailed above, that policy requires the consideration of a variety of factors, including mileage on the truck being assigned, as well as the driver's past performance, seniority, accidents, and experience. The policy does not take into account the driver's sex. Solo drivers like Schoonover receive the lowest priority in the system. Schneider notes—and Schoonover does not contest—that it is not atypical for new drivers to be assigned to drive old trucks. Old trucks led to mechanical problems, which led to consistent reassignments. Further, the record shows Schoonover was typically reassigned to different trucks not on the whim of a supervisor harboring ill will, but because the truck she was driving experienced mechanical problems.

Consequently, to the extent Schoonover suffered an adverse employment action as a result of being repeatedly assigned to different trucks, Schneider has produced a legitimate, nondiscriminatory reason for those assignments.

#### ii. Assignment of Work.

▄▄ The second adverse employment action Schneider must address is the method the company used to assign routes. As

---

**29.** To summarize the Court's task at this stage:

> [No fact remains for a trier of fact to decide] if, on the evidence presented, (1) any rational person would have to find the existence of facts constituting a *prima facie* case, and (2) the defendant has failed to meet its burden of production—i.e., has failed to introduce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action. In that event, the court must award judgment to the plaintiff as a matter of law.... If the defendant has failed to sustain its burden but reasonable minds could differ as to whether a preponderance of the evidence establishes the facts of a *prima facie* case, then a question of fact does remain, which the trier of fact will be called upon to answer.
>
> ....
>
> If the finder of fact answers affirmatively—if it finds that the *prima facie* case is supported by a preponderance of the evidence—it must find the existence of the presumed fact of unlawful discrimination and must, therefore, render a verdict for the plaintiff. Thus, the effect of failing to produce evidence to rebut the *McDonnell Douglas* ... presumption is not felt until the *prima facie* case has been *established*, either as a matter of law (because the plaintiff's facts are uncontested) or by the factfinder's determination that the plaintiff's facts are supported by a preponderance of the evidence.... As a practical matter, however, and in the real-life sequence of a trial, the defendant feels the 'burden' not when the plaintiff's *prima facie* case is *proved*, but as soon as evidence of it is *introduced*. The defendant then knows that its failure to introduce evidence of a nondiscriminatory reason will cause judgment to go against it *unless* the plaintiff's *prima facie* case is held to be inadequate in law or fails to convince the factfinder.

*Hicks*, 509 U.S. at 509–10 & n. 3, 113 S.Ct. 2742 (emphases in the original; citations omitted).

described above, transportation planners use a computer program called GSS to manage work assignments. The system is designed to maximize efficiency and profitability and is instructed to consider a catalog of factors when making freight assignments, including driver location, hours of ability, dates of availability, equipment availability, customer needs, and other objective factors. Schneider claims neither the transportation planners nor the software they use takes into account the sex of the driver. In short, Schneider has produced evidence that the bottom line of the route assignment process is efficiency, not biology. To the extent Schoonover suffered an adverse employment action through her work assignments, Schneider has produced a legitimate, nondiscriminatory reason for those assignments.

### iii. Termination of Employment.

■ The final adverse employment action allegedly inflicted upon Schoonover is the termination of her employment. In summary, Schneider claims Schoonover's employment was terminated not because of her sex, but because an internal investigation revealed she made material misrepresentations on medical questionnaires completed at or around the time of her hire.

On August 13, 2003, Schoonover unilaterally declared herself unable to work because she was taking new medication to treat a urinary tract infection. In a call to Schneider's Occupational Health Department, Schoonover revealed she did not wish to work because she was afraid of having an allergic reaction to the new medication. Schoonover declared a 24- to 48-hour driving restriction to be appropriate. In a follow-up call placed by Sullivan, Schoonover explained to Sullivan her fear of losing consciousness grew from a bad reaction to a narcotic and a loss of consciousness she experienced when she was once near cocaine.

After an investigation, Sullivan determined Schoonover provided false or incomplete information at the time of her application, and then advised Morse that the Occupational Health Department lacked documentation showing Schoonover had a drug allergy or required 24 to 48 hours off of work each time she started taking a new medication. On August 20, 2003, Morse terminated Schoonover's employment. Morse testified his decision to fire Schoonover was motivated by Sullivan's conclusion that Schoonover had failed to disclose her drug allergy and the corollary requirement that she be off work for one to two days every time she commenced a new medication.

Providing false statements on an application questionnaire is a legitimate and nondiscriminatory reason for termination. *See, e.g., Smith v. Chrysler Corp.,* 155 F.3d 799, 807–08 (6th Cir.1998); *Morgan v. City of Jasper,* 959 F.2d 1542, 1548 (11th Cir. 1992); *see also Jones,* 973 F.2d at 675 (falsifying data on employment application satisfies second stage of the *McDonnell Douglas* framework); *Osborne v. Cleland,* 620 F.2d 195, 198 (8th Cir.1980) (false answer on employment form legitimate grounds for discharge). *Cf. Pickens v. Soo Line R.R. Co.,* 264 F.3d 773, 778 (8th Cir.2001) (railroad conductor who falsified medical status and threatened to return to work with medical restrictions removed without regard for "safety and common sense" was terminated for a legitimate, nondiscriminatory reason). Especially where employees spend a great deal of time on the road alone driving vehicles that pose a heightened public danger if the driver is impaired, falsifying or failing to disclose potential health problems is a particularly valid reason to end that driver's employment. *Cf. Pickens,* 264 F.3d at 778

(because plaintiff's "position as a conductor [brought] with it the responsibility of moving trains and the possibility of catastrophic injury," intent to "disregard the safety of others in order to be employable is a legitimate, nondiscriminatory reason for discharging an employee").

Resolving whether the information Schoonover completed for Schneider was actually incorrect is not the issue at this point; a fact question on whether Schneider's employees reasonably believed Schoonover's medical history was incorrect suffices to discharge the inference of discrimination created by an (assumed) achievement of a successful *prima facie* case. *See EEOC v. Trans States Airlines, Inc.*, 462 F.3d 987, 992 (8th Cir.2006) (whether an employee actually violated a corporate policy is not dispositive; "[t]he relevant question is whether the [p]laintiffs can show that [the defendant] was motivated by discriminatory animus, rather than solely by its belief that [the employee] violated company policy"); *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir.2006) ("A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination."); *Rodgers*, 417 F.3d at 855 (requiring plaintiff to produce evidence showing employer's conclusion that employee was guilty of misconduct was incorrect). *Cf. Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051–52 (8th Cir.2006) (employer who "reasonably believed [the employee] was lying about why he took off work" articulated a legitimate reason to end employment); *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1075 (8th Cir.2006) (shifting the inquiry regarding whether a university banning a student from campus had *correctly* determine the student had threatened a professor to whether university employees "sincerely perceived" such a threat was made);

*Johnson v. AT & T Corp.*, 422 F.3d 756, 762 (8th Cir.2005) (proper inquiry is not whether the reason offered for the employee's termination is correct, but whether the employer honestly believed the employee had engaged in improper conduct); *Pope*, 406 F.3d at 1008 (primary issue is not whether employer's conclusion about alleged timecard fraud was correct but instead whether the employer "conducted a thorough investigation of the . . . incident and whether it made credibility determinations reasonably and in good faith").

The record shows Schoonover's firing was the finale of an investigation into whether she submitted false information or omitted material information from medical documents completed around the time of her hire. The Schneider Occupational Health Department concluded she did. Morse concluded she did. The Court concludes Schneider has produced evidence that she did. Schneider has satisfied its burden of production.

### c. Conclusion.

Schneider has produced a legitimate and nondiscriminatory reason for each alleged adverse employment action suffered by Schoonover.

### 3. Schoonover's Attempt to Demonstrate the Legitimate, Nondiscriminatory Explanations are a Pretext for Unlawful Discrimination.

Assuming Schoonover managed to generate a fact question on each element of her *prima facie* case, and Schneider successfully produced evidence supporting a legitimate, nondiscriminatory reason for each adverse employment action suffered by Schoonover, the burden returns to Schoonover to demonstrate Schneider's ex-

planation is a pretext for unlawful discrimination.

### a. Legal Standards.

Proof of a legitimate, nondiscriminatory explanation for the employer's actions rebuts a properly supported *prima facie* case and "destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence," *Burdine*, 450 U.S. at 255 & n. 10, 101 S.Ct. 1089; *see Hicks*, 509 U.S. at 507, 113 S.Ct. 2742 (the inference of discrimination " 'drops from the case' " (quoting *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. 1089)), and renders the shifted burden of production "irrelevant," *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742. At this stage, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," *Hicks*, 509 U.S. at 510, 113 S.Ct. 2742, reducing the case to resolution of the sole issue of "discrimination vel non," *Aikens*, 460 U.S. at 714, 103 S.Ct. 1478; *accord Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097. The analysis now "proceeds. to a new level of specificity," *Burdine*, 450 U.S. at 255, 101 S.Ct. 1089, meaning the inquiry "turns from the few generalized factors that establish a *prima facie* case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced," *Hicks*, 509 U.S. at 516, 113 S.Ct. 2742. A new level of specificity means the burden upon the plaintiff is more than at the *prima facie* stage: "[m]ore substantial evidence of discrimination is required to prove pretext, because evidence of pretext is viewed in the light of [the employer]'s legitimate, non-discriminatory explanation." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 992 (8th Cir.2006) (citing *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir.2001)).

 To pass through the third stage of the *McDonnell Douglas* framework to arrive at a trial, a plaintiff must show "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. The Supreme Court has observed that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown both that the reason was false, and that discrimination was the real reason." Hicks, 509 U.S. at 515, 113 S.Ct. 2742.[30] Howev-

**30.** Originally, the Court held that a plaintiff could succeed "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. This alternative language—dicta, as the Court later called it (in order to reconcile *Burdine* with itself), *see Hicks*, 509 U.S. at 518, 113 S.Ct. 2742—was eventually removed from Title VII parlance to the extent it "describe[d] disproof of the defendant's reason as a totally independent, rather than an auxiliary, means of proving unlawful intent," *Id*. at 517–18, 113 S.Ct. 2742.

Reducing proof that the employer's reason for discrimination is false to an "auxiliary ... means of proving unlawful intent" means disproving the defendant's explanation for its actions does not automatically result in a tri-al. *See Hicks*, 509 U.S. at 511 & n. 4, 113 S.Ct. 2742. The Court went to great lengths to distinguish situations where the defendant's proffered reason is discredited (resulting in passage from the second to the third stage of the *McDonnell Douglas* framework) from situations where the plaintiff generates a fact question regarding whether the suspect employment action was motivated by an improper reason (resulting in passage from the summary judgment stage to a trial). *See Hicks*, 509 U.S. at 513–20 & nn. 5–7, 113 S.Ct. 2742. "[T]he required finding that the employer's action was the product of unlawful discrimination," the Court wrote, is a different thing entirely from "the much different (and much lesser) finding that the employer's explanation of its action was not believable" (unless the level of proof at the *prima facie* stage is "so high that it would, in absence of rebuttal, require a directed verdict for the plaintiff," an

er, even evidence that " 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct.' " *Reeves*, 530 U.S. at 146–47, 120 S.Ct. 2097 (quoting *Hicks*, 509 U.S. at 524, 113 S.Ct. 2742); *see Hicks*, 509 U.S. at 519, 113 S.Ct. 2742 (holding that "[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination" (emphases in the original)). Still, "a plaintiff's *prima facie* case, combined with sufficient evidence that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097; *see Id.* at 147, 120 S.Ct. 2097 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742 (because "disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima* facie case, suffice to show intentional discrimination," "rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination"), 517 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination".). Allowing evidence that the defendant's explanation is false to serve as evidence of intentional discrimination is a byproduct of "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.' " *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (quoting *Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992)).

 Of course, evidence that the defendant's explanation is false does not necessarily mean the plaintiff obtains a trial. "[T]here will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* at 148, 120 S.Ct. 2097. For example, weak evidence that the employer's justification for the adverse employment action was contrived coupled with "abundant and uncontroverted independent evidence that no discrimination had occurred" may result in judgment for the employer. *Id.* Conversely, even though a legitimate, nondiscriminatory explanation proffered "destroys" a plaintiff's *prima facie* case, evidence and

interpretation of *McDonnell Douglas* the Court rejected). *Id.* at 514–15, 113 S.Ct. 2742; *see also Reeves*, 530 U.S. at 146, 120 S.Ct. 2097 ("[T]he factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff." (discussing Hicks, 509 U.S. at 511, 113 S.Ct. 2742)).

Our circuit has preserved the "indirect" approach pioneered in *Burdine* and refined in *Reeves*, and has usually (but not always, *e.g.*, *Stallings*, 447 F.3d at 1052) taken care to explain that discrediting an employer's reason for an adverse employment action does not automatically lead to a trial unless there is a broader rebuttal of the facts used by the employer to support the reason offered for the employee's discharge, *e. g.*, *DTG Operations, Inc.*, 442 F.3d at 1120–21. Alternatively, a plaintiff may trek the "direct" path by bypassing the employer's *underlying* factual claims (and may even concede the employer's proffered reason would have been a sufficient reason for the adverse employment action) while focusing on the *ultimate* factual claim regarding the absence of an improper intent. *See, e.g.*, *Stallings*, 447 F.3d at 1052; *DTG Operations, Inc.*, 442 F.3d at 1121. The difference is a subtle but important one.

inferences from a plaintiff's *prima facie* case may be considered when assessing whether the defendant's explanation is pretextual. *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. 1089; *see Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (consideration of a plaintiff's *prima facie* case and inferences therefrom is appropriate when deciding whether a defendant's proffered reason is pretextual). As a result, a strong *prima facie* case, coupled with enough admissions by a defendant, can resurrect the inference of discriminatory intent discharged by a legitimate reason for an adverse employment action. *See Hicks*, 509 U.S. at 508, 113 S.Ct. 2742; *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. 1089.

Our circuit has developed a menu of methods from which an employee may banquet (either à la carte or table d'hôte) to demonstrate pretext, among them are proof that the plaintiff was treated differently than similarly-situated co-workers outside the protected class, *e.g.*, *Allen v. Tobacco Superstore, Inc.*, 475 F.3d 931, 937–38 (8th Cir.2007); *Elnashar*, 484 F.3d at 1057; *Ledbetter*, 437 F.3d at 723; *Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 550 (8th Cir.2005); *Pope*, 406 F.3d at 1009; *Wheeler*, 360 F.3d at 859; *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir.2003); *Bogren*, 236 F.3d at 404–05; *Lynn*, 160 F.3d at 487–89; *Ghane v. West*, 148 F.3d 979, 982 (8th Cir.1998); *Rose–Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 (8th Cir.1998), proof that a less-qualified individual was chosen for a position or promotion, *e.g.*, *Peterson*, 406 F.3d at 523; *Hammer v. Ashcroft*, 383 F.3d 722, 724–25 (8th Cir.2004); *Duffy v. Wolle*, 123 F.3d 1026, 1037–38 (8th Cir.1997), proof that the employer's reason for the adverse employment action shifted from one reason to another over time, *e.g.*, *Trans States Airlines*, 462 F.3d at 995; *Arraleh v. County of Ramsey*, 461 F.3d 967, 976 (8th Cir.2006); *Stallings*, 447 F.3d at 1052;

*Rodgers*, 417 F.3d at 855; *Etukakpan v. St. Jude Med., Inc.*, 13 Fed.Appx. 477, 480 (8th Cir.2001); *Young v. Warner–Jenkinson Co.*, 152 F.3d 1018, 1023 (8th Cir.1998) (collecting authorities); *Briscoe v. Fred's Dollar Store, Inc.*, 24 F.3d 1026, 1028 (8th Cir.1994), as well as evidence supporting the plaintiff's *prima facie* case.

The burden remains squarely on the plaintiff to point to facts showing the need for a trial to resolve the core issue, *videlicet*: whether on the record before the Court a reasonable trier of fact *could* decide the plaintiff's proposition that intentional discrimination occurred is correct. *See Aikens*, 460 U.S. at 714–15, 103 S.Ct. 1478.

### b. Analysis.

#### i. Assignment of Equipment and Work.

 Schneider has consistently maintained that its compliance with the GSS and Van Tractor Assignment Policy is conclusive proof that the objective factors required by those systems motivated Schoonover's work and equipment. While conceding Schneider has objective systems in place to assign equipment and routes, Schoonover claims a "human element" can be at play in both.

Beginning with the truck assignment procedures, Schoonover identifies not one instance where the Van Tractor Assignment Policy was manipulated or disregarded to her detriment and in favor of a male driver. Instead, her claim that her male co-workers were assigned to different vehicles less frequently is supported by her own observations, her impressions of industry custom as informed by trade publications, and hearsay statements by unidentified male drivers. None of this evidence suggests either that Schneider's proffered reason for its equipment assignments is

false (i.e., that Schneider did not use or did use but manipulated the Van Tractor Assignment Policy), or that the decisions the company made were motivated by a desire to treat Schoonover differently because of her gender (*i.e.*, that Schneider did not typically reassign Schoonover because of mechanical problems she experienced but for a different reason).

Turning to the GSS system, again, Schoonover has no evidence suggesting the system was not used to make her route assignments. The Court is aware Morse acknowledged that in some circumstances, transportation planners might adjust routes to ensure a load is delivered. However, there is no evidence a transportation planner did that here. The Court is also aware that shortly after Williams allegedly acknowledged Schoonover had spent enough time traveling east, she departed to Wyoming and Utah. However, this is not evidence that the GSS system was not followed, nor is it evidence that Schoonover's previous assignments were made because of her sex. As noted above, the record shows Schneider's primary zone of commercial activity was east of Des Moines. The fact that Schoonover was not permitted to cherry-pick the most desirable assignments does not generate an inference her assignments to more routine routes were based on her sex. Finally, the Court is aware that, viewed favorably to Schoonover, the record establishes she was taken from at least two potentially profitable westbound trips and provided replacement jobs headed east. However, as above, Schoonover has identified no similarly-situated male to whom these routes were given. In fact, she points to no male comparator at all.

Because Schoonover has failed to demonstrate that Schneider's proffered reason for her equipment and route assignments is unworthy of credence, or that sufficient

evidence exists suggesting Schneider's employees acted with a discriminatory animus when making those assignments, the Court concludes Schoonover has failed to show Schneider's explanation is pretextual for unlawful discrimination.

### ii. Termination of Employment.

Schoonover must next discredit the reason offered for her termination. As noted above, Schneider claims Schoonover was terminated because she provided false or incomplete information about potential drug allergies on forms submitted when she applied for employment.

Schoonover first argues that for Schneider's proffered reason to hold water, Schneider must show none of its employees were aware of Schoonover's potential allergic reaction to new medications or her desire to take a short time off when she started new medications. Schoonover then points to evidence suggesting Schneider was either aware or should have been aware of her condition because she informed a medical examiner of her condition and had told her trainer and Morse twice about possible work restrictions related to drug allergies.

This argument is flawed because it rebuts a legitimate, nondiscriminatory explanation for Schoonover's termination that Schneider did not proffer. Schneider did not terminate Schoonover because no Schneider employee knew of Schoonover's condition; Schneider fired Schoonover because she failed to disclose her condition on a battery of forms. The two situations are entirely different.

Schoonover's argument that Schneider's reason for her termination is a pretext for discrimination because she was directed by the medical examiner administering the Medical Examination Report to indicate she had not experienced any loss of consciousness is also misplaced. First, even if

this is so, Sullivan finds falsities and omissions on other forms completed or endorsed by Schoonover. As a result, even ignoring the Medical Examination Report, Schoonover has not rebutted each piece of evidence supporting Schneider's reason for her discharge. Second, Schoonover's argument does not prove the information she submitted was not false, it merely provides an explanation—unknown to Sullivan at the time she recommended termination and apparently by Morse (because of forgetfulness or because Schoonover did not tell him) at the time he terminated her—for the falsity. Third, and most importantly, whether Schoonover *intended* to provide false information, though perhaps important to her, is not sufficient as a legal matter. Indeed, she may not have. The crucial inquiry is whether Schneider believed, after a good faith investigation, that she did. *See Trans States Airlines,* 462 F.3d at 992; *Twymon,* 462 F.3d at 935; *Stallings,* 447 F.3d at 1051–52; *Mershon,* 442 F.3d at 1075; *Johnson,* 422 F.3d at 762; *Rodgers,* 417 F.3d at 855; *Pope,* 406 F.3d at 1008. Schoonover has presenting nothing upon which the Court could conclude that Schneider's investigation was other than objective, fair, and based on the best available evidence.

Finally, the argument that Schoonover told others at Schneider—Morse and a trainer—of her allergic reactions does not save Schoonover's case. The comments to Morse and her trainer were uttered after Schoonover's false and misleading medical records had been used to obtain Schoonover a job.

### c. Conclusion.

The Court concludes the evidence offered by Schoonover does not aid her in generating a fact issue, either that Schneider's reason for her termination is unworthy of credence or that some unlawful intent motivated Morse's decision to end her employment.

### C. Conclusion.

The Court concludes Schoonover cannot generate a *prima facie* case with respect to whether any of the proposed adverse employment actions (to the extent such actions occurred) occurred under circumstances giving rise to an inference that they occurred because of Schoonover's sex. Even if Schoonover could present such a case, the Court concludes Schneider has provided legitimate, nondiscriminatory reasons for each employment action identified. Because Schoonover has not properly demonstrated these explanations are a pretext for discrimination or that Schoonover's sex was the determinative factor for any proposed adverse employment action, the Court must grant Schneider's Motion for Summary Judgment with respect to Schoonover's sex discrimination claim.

## III. Retaliation Claims.

The Court turns to Schneider's Motion for Summary Judgment on Schoonover's ICRA and Title VII retaliation claims.

### A. Legal Standards.

Section 704(a) of the Federal Civil Rights Act of 1964 renders it "an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Similarly, section 8 of the Iowa Civil Rights Act of 1965, as amended, makes it an "unfair or discriminatory practice for" an employer "to discriminate or retaliate against another person in any of

the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter." Iowa Code § 216.11(2).[31]

Under the federal statute, an employer is prohibited from "discriminat[ing] against" an employee or job applicant because the individual "has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White,* ⸺ U.S. ⸺, ⸺, 126 S.Ct. 2405, 2410, 165 L.Ed.2d 345 (2006) (quoting 42 U.S.C. § 2000e–3(a)). "Discriminate against" means to create "distinctions or differences in treatment that injure protected individuals." *Id.* (citing *Jackson v. Birmingham Bd. of Ed.,* 544 U.S. 167, 174, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005); *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality op.)).

▌ Because Schoonover does not allege or prove the existence of direct evidence of retaliation, the *McDonnell Doug-* *las* framework applies to her retaliation claim. *Stewart v. Indep. Sch. Dist. No. 196,* 481 F.3d 1034, 1042–43 (8th Cir. 2007);[32] *Corwin,* 483 F.3d at 530; *Carrington v. City of Des Moines,* 481 F.3d 1046, 1050 (8th Cir.2007). As a result, the framework discussed in considerable detail above applies here.

## B. Analysis.

The Court begins by assessing Schoonover's *prima facie* case.

### 1. Schoonover's *Prima facie* Case.

▌ To set forth a *prima facie* case of retaliatory discharge under section 704(a) of the Civil Rights Act of 1964, a plaintiff must show (1) she engaged in statutorily protected conduct, (2) a reasonable employee would have found the challenged retaliatory action materially adverse, and (3) the materially adverse action was causally related to the protected conduct. *Carrington,* 481 F.3d at 1050; *Carpenter v. Con–Way Cent. Express, Inc.,* 481 F.3d 611, 618 (8th Cir.2007); *Higgins,* 481 F.3d at 589; *see also Vajdl v. Mesabi Academy of KidsPeace, Inc.,* 484 F.3d 546, 552 (8th Cir.2007).[33] In *Burlington North-*

---

**31.** With one potentially applicable exception, *see infra* note 33, retaliation cases brought under the Iowa Civil Rights Act of 1965 are governed by the same framework as cases brought under the federal Civil Rights Act of 1964. *See Boyle v. Alum–Line, Inc.,* 710 N.W.2d 741, 750 (Iowa 2006); *Channon v. United Parcel Service, Inc.,* 629 N.W.2d 835, 861–62 (Iowa 2001); *Hulme,* 449 N.W.2d at 632.

**32.** In *Stewart v. Independent School District No. 196,* the court equated the framework applicable to Title VII claims to that used for claims brought under the Americans with Disabilities Act (ADA) and the Age Discrimination in Employment Act (ADEA). *Stewart,* 481 F.3d at 1037 & n. 3, 1042–43. Consequently, even though *Stewart* turned on an ADEA claim, the principles espoused there are equally applicable here.

**33.** This standard differs from that used before *Burlington Northern.* The old test—and the one used by the parties in their papers and at the hearing—required a plaintiff to establish that (1) she was engaged in a statutorily protected activity, (2) she suffered an adverse employment action which produced a material employment disadvantage or a material change in the terms or conditions of employment, and (3) there is a causal connection between the two. *Stewart,* 481 F.3d at 1043; *Corwin,* 483 F.3d at 530; *Box,* 442 F.3d at 696. The pre-*Burlington Northern* test has appeared in some post-*Burlington Northern* opinions authored by our circuit, *e.g., Corwin,* 483 F.3d at 530–31; *Allen,* 475 F.3d at 939; *Wells,* 469 F.3d at 702; *Clark v. Johanns,* 460

*ern & Santa Fe Railway Co. v. White,* the Supreme Court explained that the second element is objective, thus requiring courts to consider whether "a reasonable employee would have found the challenged conduct materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern,* 126 S.Ct. at 2415 (quotation marks omitted). Material adversity is required "because it is important to separate significant from trivial harms." *Id.* "Title VII," after all, neither "set[s] forth 'a general civility code for the American workplace,'" nor is it designed to referee "normal petty slights, minor annoyances, and simple lack of good manners." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Instead, its protections were intended to "prohibit[ ] employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Id.* (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). An objective standard properly gauges the challenged conduct of the employer against the likely actions of a reasonable employee by "avoid[ing] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.*

### a. Engagement in a Protected Activity.

Schoonover must first demonstrate a genuine issue of material fact exists with respect to whether she engaged in an activity protected by Title VII.

 Section 704(a) qualifies both opposing an unlawful employment practice and participating in an investigation, proceeding, or hearing arising out of such a

F.3d 1064, 1067 (8th Cir.2006); *Green v. Franklin Nat'l Bank of Minneapolis,* 459 F.3d 903, 914 (8th Cir.2006); *Lewis v. St. Cloud State Univ.,* 467 F.3d 1133, 1138 (8th Cir. 2006); *Thompson v. Bi–State Dev. Agency,* 463 F.3d 821, 826 (8th Cir.2006); *Arraleh,* 461 F.3d at 977; *Robinson v. Potter,* 453 F.3d 990, 994 (8th Cir.2006); *cf. Hughes v. Stottlemyre,* 454 F.3d 791, 796–97 (8th Cir.2006) (holding that First Amendment retaliation claims are governed by the same standard as Title VII retaliation claims, then stating old test), but in all but one instance, the court's usage of old verbiage is of only academic importance because the cases were resolved on different legal, *see Hughes,* 454 F.3d at 796–97 (First Amendment retaliation); *Lewis,* 467 F.3d at 1138 (ADEA retaliation), or factual grounds, *e.g., Corwin,* 483 F.3d at 531 (insufficient evidence of causation); *Wells,* 469 F.3d at 702–03 (same); *Lewis,* 467 F.3d at 1138 (same); *Thompson,* 463 F.3d at 826–27 (same); *Clark,* 460 F.3d at 1067 (failure to show engagement in a protected activity) *Arraleh,* 461 F.3d at 977–78 (insufficient showing that the employer's proffered reasons for employment action were pretextual); *Franklin Nat'l Bank of Minneapolis,* 459 F.3d at 914–17 (same); *Robinson,* 453 F.3d at 994 (same). *But see Allen,*

475 F.3d at 939 (concluding denial of a promotion constituted an adverse employment action in a successful retaliation claim).

Applied here, both tests reach the same result: The employer's action—termination—is both an adverse employment action under the old standard, *see, e.g., Corwin,* 483 F.3d at 531, and an action that a reasonable employee would find to be materially adverse under the new standard, *see, e.g., Carrington,* 481 F.3d at 1051.

Finally, the Court notes the Supreme Court of Iowa has not yet passed on *Burlington Northern's* impact on retaliation cases brought under the Iowa Civil Rights Act of 1965. Before *Burlington Northern,* Iowa law used an analytical framework similar to the old Eighth Circuit test. *See, e.g., Boyle,* 710 N.W.2d at 750; *Est. of Harris v. Papa John's Pizza,* 679 N.W.2d 673, 678 (Iowa 2004); *Channon,* 629 N.W.2d at 861–62. As noted, the result is the same regardless of which standard is followed. It follows that this Court need not resolve *Burlington Northern's* impact, if any, on this area of Iowa jurisprudence.

practice as protected activities. *See* 42 U.S.C. § 2000e–3(a). So-called "opposition clause" cases typically require proof that the plaintiff opposed an unlawful employment practice, *see Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028–29 (8th Cir. 2002); *Brower v. Runyon*, 178 F.3d 1002, 1005 n. 3 (8th Cir.1999), and "participation clause" cases typically require retaliation for participation "in any manner" in an "investigation, proceeding, or hearing," initiated by the EEOC or its designee, 42 U.S.C. § 2000e–3(a); *see generally Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 741–42 (8th Cir.2005) (Colloton, J., concurring in part and dissenting in part) (distinguishing "opposition clause" from "participation clause" cases); *Neb. Pub. Power Dist.*, 282 F.3d at 1028 (dividing section 704(a) into an "opposition" and "participation" clauses for analytical purposes). Because there was no investigation, proceeding, or hearing in which Schoonover could have participated, Schneider is liable for retaliation under the opposition clause or is not liable at all.

■ Our circuit has interpreted the "opposition clause" broadly to protect an employee's opposition to employment practices eventually shown to be unlawful, as well as to employment practices that are not unlawful but which the employee opposed with a good faith, objectively reasonable belief that the practices were unlawful. *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006); *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 n. 3 (8th Cir.2005); *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 858 (8th Cir.2005); *Peterson*, 406 F.3d at 524 n. 3; *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 634 (8th Cir.2000); *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir.2000); *Evans v. Kansas City, Mo. Sch. Dist.*, 65 F.3d 98, 100 (8th Cir.1995); *Sisco v. J.S. Alberici Constr. Co.*, 655 F.2d 146,

150 (8th Cir.1981). *But see Neb. Pub. Power Dist.*, 282 F.3d at 1028–29 (plaintiff's conduct would have been swept within the opposition clause, but for the plaintiff's failure "to present sufficient evidence that she opposed an *unlawful* employment practice prior to her termination" (emphasis in the original)). It follows that success on an underlying discrimination claim is unnecessary to succeed on an opposition clause retaliation claim. *Franklin Nat'l Bank of Minneapolis*, 459 F.3d at 914; *DTG Operations*, 442 F.3d at 1118; *Logan*, 416 F.3d at 881 n. 3; *Sparks Health Sys.*, 415 F.3d at 858; *Peterson*, 406 F.3d at 524 n. 3; *Stuart*, 217 F.3d 621; *Buettner*, 216 F.3d at 714; *Sisco*, 655 F.2d at 150.

■ Engagement in a statutorily protected activity occurs where the plaintiff files a formal complaint protesting the allegedly unlawful activity, see *Allen*, 475 F.3d at 939; *Wells*, 469 F.3d at 702; *Franklin Nat'l Bank of Minneapolis*, 459 F.3d at 914; *Powell*, 445 F.3d at 1079, or has *"report[ed]* the alleged wrongful activity" or "actively *complained* about" discrimination, *Franklin Nat'l Bank of Minneapolis*, 459 F.3d at 914 (emphases added); *see Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir.2005) (reporting harassing conduct to human resources department); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850–51 (8th Cir.2005) (complaints to superiors and an investigator and written harassment complaint); *Peterson*, 406 F.3d at 520, 524–25 & n. 3 (repeated complaints to superiors); *Buettner*, 216 F.3d at 714–15 & n. 7 (repeated complaints to superiors and human resources personnel); *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir.2000) (telling harassing supervisor to stop offensive behavior); *Sisco*, 655 F.2d at 148, 150 (protests to employer). A plaintiff must have

actually formulated a reasonable belief that unlawful activity was occurring for there to have been unlawful conduct to oppose.

It follows that workplace complaints untethered to conduct a reasonable person would believe to be violative of Title VII are not remediable through a retaliation claim. *See Pope,* 406 F.3d at 1010 (observation by a black plaintiff of an absence of minorities in a position in which the plaintiff had expressed interest deemed insufficient to constitute opposition to an unlawful employment practice because the plaintiff did not attribute the lack of minorities in that position to racial discrimination); *Hunt,* 282 F.3d at 1028–29 (plaintiff's complaints that she was entitled to a pay increase and change in job title held not to be a protected activity without corresponding complaint that her employer's failure to give her these benefits was attributable to sex discrimination); *Curd v. Hank's Discount Fine Furniture, Inc.,* 272 F.3d 1039, 1041 (8th Cir.2001) (per curiam) (e-mail from plaintiff to supervisor complaining of conduct plaintiff believed was offensive insufficient to amount to engagement in an activity protected by Title VII); *Genosky v. Minnesota,* 244 F.3d 989, 993 (8th Cir.2001) (complaints of unfair treatment is not equivalent to complaints about unlawful discriminatory treatment); *see also White v. ConAgra Poultry Co.,* 153 Fed.Appx. 405, 406 (8th Cir.2005) (employee who "ma[kes] no complaints and file[s] no grievances about" allegedly unlawful conduct has not engaged in statutorily protected activity); *Green v. City of Pine Bluff, Ark.,* 105 Fed.Appx. 880, 882 (8th Cir.2004) (per curiam) (failure to report "harassing behavior to her supervisors or anyone up the chain of command" evidence that plaintiff did not engage in conduct protected by Title VII); *Rone v. U.S. Sprint,* 49 Fed. Appx. 659, 660 (8th Cir.2002) (per curiam) (plaintiff's complaint about article in an internal corporate newsletter is not engagement in a protected activity because the plaintiff failed to indicate she believed the article was discriminatory in a manner barred by Title VII).

■ Schoonover argues she engaged in a protected activity by complaining to Williams and Houdesheldt in early August 2005 that she believed she was receiving what she perceived to be subpar truck and load assignments because of her gender. Countering, Schneider claims Schoonover's conduct was insufficient. Specifically, Schneider argues that during the August 2003 meeting, Schoonover *complained* about pay discrepancies on her paycheck but merely *inquired* regarding whether her equipment and work assignments were based on gender. Asking whether sex discrimination is occurring, Schneider claims, is different from opposing a practice the employee reasonably believes is discriminatory.

In each case where our circuit concluded a plaintiff opposed a practice reasonably believed to be discriminatory, it is evidence the plaintiff had formed a belief that a discriminatory practice was ongoing and either reported or complained about the practice. *See Franklin Nat'l Bank of Minneapolis,* 459 F.3d at 914 (plaintiff reported and complained of practice believed to be discriminatory); *Kasper,* 425 F.3d at 502 (plaintiff reported harassing conduct); *Peterson,* 406 F.3d at 520, 524–25 & n. 3 (plaintiff complained of conduct); *Buettner,* 216 F.3d at 714–15 & n. 7 (plaintiff complained of conduct); *Ogden,* 214 F.3d at 1007 (plaintiff told harassing supervisor to cease offensive behavior); *Sisco,* 655 F.2d at 148, 150 (plaintiff protested barred conduct). By way of contrast, if a generic workplace complaint is lodged without a contemporaneous connection between the

complaint and a belief that the conduct complained of is barred by Title VII, there can be no retaliation. *See Pope,* 406 F.3d at 1010; *White,* 153 Fed.Appx. at 405–06; *City of Pine Bluff,* Ark., 105 Fed.Appx. at 882; *Rone,* 49 Fed.Appx. at 660; *Hunt,* 282 F.3d at 1028–29; *Curd,* 272 F.3d at 1041; *Genosky,* 244 F.3d at 993. This rule is logical: An employer cannot intentionally retaliate against an employee who opposes a proposed unlawful employment practice if the employer cannot have known the employee was actually opposing an employment practice the employee believed was unlawful.

Schoonover's own deposition shows she asked whether she was being discriminated against. The fact that Schoonover felt compelled to *inquire* belies any notion that she had already formed a belief that an unlawful employment practice was occurring. A query is not an accusation, the act of asking is distinct from the act of expostulating, and information gathering must precede a critique. The Court must side with Schneider on this issue and conclude that Schoonover's requests on their face and in the manner her own testimony characterizes did not constitute opposition to an unlawful employment activity and therefore did not amount to engagement in a statutorily protected activity.

### b. Materially Adverse Action.

■■■ Assuming Schoonover could present sufficient evidence on the first prong of her *prima facie* case, Schoonover must then demonstrate she suffered an employment action a reasonable employee would

find materially adverse. *See Burlington Northern,* 126 S.Ct. at 2415; *Vajdl,* 484 F.3d at 552; *Carrington,* 481 F.3d at 1050; *Carpenter,* 481 F.3d at 618; *Higgins,* 481 F.3d at 589. As noted above, this test requires the Court to consider, under an objective standard, whether a reasonable employee in the plaintiff's shoes may have been dissuaded from making a discrimination claim as a result of the employer's retaliatory action. *See Burlington Northern,* 126 S.Ct. at 2414–15; *Vajdl,* 484 F.3d at 552; *Carrington,* 481 F.3d at 1050; *Carpenter,* 481 F.3d at 618–19; *Higgins,* 481 F.3d at 589–90.

Schoonover does not claim her work and equipment assignments were retaliatory for her opposition to any unlawful employment practices.[34] The record shows, however, that Schoonover was fired. Fear of having one's employment terminated would certainly dissuade a reasonable employee from making or opposing a discrimination claim. *See Carrington,* 481 F.3d at 1050 (firing satisfies the second element of the post-*Burlington Northern* test).

The record contains a genuine issue of material fact on this element.

### c. Evidence of Causation.

To complete her *prima facie* case, Schoonover must demonstrate a causal connection between the engagement in the statutorily protected activity and the identified adverse employment action.

Schoonover relies almost exclusively on evidence of timing to support her argument, noting the short passage of time

**34.** If Schoonover made such a claim, it would fail because her work and equipment assignments occurred before her August 2003 meeting with Williams and Houdesheldt. If the purportedly adverse employment action occurs before the act the employer allegedly retaliated against, the plaintiff's claim fails. *See Stewart,* 481 F.3d at 1044 ("'[A]lleged re-

taliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event."); *see also Burlington Northern,* 126 S.Ct. at 2416 ("[T]he standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint.").

between the meeting on August 4 or 5 and her termination on August 20. Schneider claims this argument fails for a pair of reasons. First, Schneider claims Schoonover cannot demonstrate the decisionmaker with respect to her termination was aware of the meeting where the alleged complaints of discrimination were made. Schneider also claims Schoonover's temporal proximity evidence is insufficient to create a fact question regarding whether her termination was motivated by a prohibited reason.

■ Beginning with evidence of timing, depending on the circumstances, engagement in a protected activity closely followed by an event a reasonable employee would consider materially adverse can suffice to establish an inference that the two events were connected. *See Thompson v. Bi–State Dev. Agency*, 463 F.3d 821, 826 (8th Cir.2006); *Franklin Nat'l Bank of Minneapolis*, 459 F.3d at 915; *Peterson*, 406 F.3d at 524–25; *Mitchell v. Iowa Prot. & Advocacy Servs., Inc.*, 325 F.3d 1011, 1014 (8th Cir.2003); *Sherman v. Runyon*, 235 F.3d 406, 410 (8th Cir.2000); *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819 (8th Cir.1998); *see Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir. 1992) (ERISA retaliation claim); *Mathews*

*v. Trilogy Commc'ns, Inc.*, 143 F.3d 1160, 1166 (8th Cir.1998) (same). Conversely, a large time gap between participation in the protected activity and the retaliatory act " 'weakens the inference of retaliation that rises when a retaliatory act occurs shortly after a complaint.' " *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 731 (8th Cir.2002) (quoting *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 989 (8th Cir.1999)); *see Stewart*, 481 F.3d at 1044 (holding that "a gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive;" "given a delay of sufficient length, the causal nexus tends to evaporate" (quotation marks omitted)); *accord* Wells, 469 F.3d at 702 (quoting *Hesse*, 394 F.3d at 633); *see also Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1036 (8th Cir. 2005); *Sowell*, 251 F.3d at 685; *Sims v. Sauer–Sundstrand Co.*, 130 F.3d 341, 343–44 (8th Cir.1997).

■ As a result, merely counting the number of days between engagement in a protected activity and the subject employment action is not always an accurately calibrated detector of causation. A sampling from the cornucopia of retaliation cases published by our circuit shows why: [35]

| Temporal Evidence Sufficient to Infer Causation | Temporal Evidence Insufficient to Infer Causation |
| --- | --- |
| Five days. *Logan*, 416 F.3d at 878–79, 881. | Two days. *Sherman*, 235 F.3d at 410. |
| Six days. *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 761 (8th Cir.2004) (section 1981 claim).* | At most five days. *Caudill v. Farmland Indus.*, 919 F.2d 83, 86–87 (8th Cir.1990) (ADEA discrimination).* |
| Twenty-three days. *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980). | Twenty-four days. *Zhuang*, 414 F.3d at 856–57. |

**35.** An asterisk indicates the court relied on other evidence to support an initial showing of causation, but that temporal evidence supported an inference of causation, or a significant amount of other evidence eroded an otherwise strong inference established by temporal evidence. To save space, the Court employs the following abbreviations: "ERISA retaliation" means a retaliation claim premised on section 510 of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1140; "ADEA retaliation" means a retaliation claim premised on section 4(d) of the ADA, 29 U.S.C. § 623(d); "FMLA retaliation" means a retaliation claim premised on section 105(a) of the FMLA, 29 U.S.C. § 2615(a).

Two weeks. *Peterson*, 406 F.3d at 524–25; *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832–33 ([8th Cir.]2002) (FMLA retaliation).

Three weeks. *See Arraleh*, 461 F.3d at 977–78.

| | |
|---|---|
| One month. *Couty v. Dole*, 886 F.2d 147, 148 (8th Cir. 1989); *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 725–27, 738–39 (8th Cir.2000) (2–1 decision).* | One month. *Cheshewalla*, 415 F.3d at 852 (8th Cir.2005); *Gagnon v. Sprint Corp.*, 284 F.3d 839, 851–52 (8th Cir. 2002), overruled on other grounds *Mole v. Buckhorn Rubber Prods. Inc.*, 165 F.3d 1212, 1216 (8th Cir.1999)*; *Curd*, 272 F.3d at 1041–42; *Nelson v. J.C. Penney Co.*, 75 F.3d 343, 346–47 (8th Cir.1996). |
| "[P]eriods much longer than . . . three weeks." *Franklin Nat'l Bank of Minneapolis*, 459 F.3d at 915. | Six weeks. *Feltmann v. Seiben[Sieben]*, 108 F.3d 970, 977 (8th Cir.1997). |
| "Matter of weeks." *Sprenger*, 253 F.3d at 1113–14 (ADA claim). | |
| Less than two months. *Keys v. Lutheran Family & Children's Servs. of Mo.*, 668 F.2d 356, 358 (8th Cir.1981). | |
| Two months. *See Mathews v. Trilogy Commc'ns, Inc.*, 143 F.3d 1160, 1166 (8th Cir.1998) (ERISA retaliation). | Two months. *Kipp. v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir.2002); *see Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 616 (8th Cir.2003) (ADEA claim). |
| Three months. *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1193 (8th Cir.1995) (ADEA retaliation); *Riceland Foods, Inc.*, 151 F.3d at 819–20;* *see Bassett v. City of Minneapolis*, 211 F.3d 1097, 1105–06 (8th Cir.2000).* | Three months. *See Tenkku v. Normandy Bank*, 348 F.3d 737, 742 (8th Cir.2003);* *Horrocks v. Mech. Breakdown Prot., Inc.*, 32 Fed.Appx. 159, 162 (8th Cir.2002). |
| | Four months. *Thompson*, 463 F.3d at 826; *Dhyne*, 184 F.3d at 989; *Eley v. U.S. Dep't of Veterans Affairs*, 95 Fed.Appx. 190, 192 (8th Cir.2004). |
| Six months. *St. Louis Univ.*, 109 F.3d at 1266. | Six months. *Stewart*, 481 F.3d at 1044; *Rath*, 978 F.2d at 1090 (ERISA claim); *see Valdez v. Mercy Hosp.*, 961 F.2d 1401, 1403 (8th Cir.1992). |
| At most seven months. *Davis v. Fleming Cos.*, 55 F.3d 1369, 1371–74 (8th Cir.1995) (2–1 decision). | Seven months. *Sowell*, 251 F.3d at 685. |
| Five to eight months. *See Eliserio v. United Steelworkers of Am.*, 398 F.3d 1071, 1079 (8th Cir.2005) ("early 2001" to September 2001).* | Nine months. *Krough v. Cessford Constr. Co.*, 336 F.3d 710, 712 (8th Cir.2003). |
| | Ten months. *Shanklin v. Fitzgerald*, 397 F.3d 596, 604 (8th Cir.2005). |
| | Eleven months. *Lewis*, 467 F.3d at 1138 (ADEA claim). |
| | Nearly a year. *Federated Mut. Ins. Co.*, 425 F.3d at 503; *Sparks Health Sys.*, 415 F.3d at 859. |
| | Seventeen months. *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 731 (8th Cir.2002). |
| | Twenty months. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 274, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam). |
| | Almost two years. *Hesse*, 394 F.3d at 633. |
| | More than two years. *Henderson*, 403 F.3d at 1037. |
| | Thirty-four months. *Wells*, 469 F.3d at 702. |

Diversity is to be expected, perhaps:

A causal connection implies not just a relationship between two events, but a

certain type of relationship in which one event is generated by the other. Temporal proximity can point to such a relationship, but the fact of two events occurring close in time does not eliminate the possibility of a mere coincidence. The closer in time two events are found to occur, however, the greater the odds become that one is caused by the other or that both are caused by a separate, third event. *Zhuang*, 414 F.3d at 856. Typically, though, timing alone is not enough, *Thomas*, 483 F.3d at 531; *Franklin Nat'l Bank of Minneapolis*, 459 F.3d at 915; *Zhuang*, 414 F.3d at 856; *Peterson*, 406 F.3d at 524 (8th Cir. 2005); *Eliserio*, 398 F.3d at 1079; *Sowell*, 251 F.3d at 685; *Buettner*, 216 F.3d at 716; *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.1999) (en banc). *But see Logan*, 416 F.3d at 881 ("We agree with [the plaintiff] that the close proximity in time between her report of alleged sexual harassment and her demotion is enough to establish the causation element of her *prima facie* case."); *Sparks Health Sys.*, 415 F.3d at 859 (temporal proximity is sufficient to establish an inference of a causal link if the connection is very close); *Kohler*, 335 F.3d at 773 n. 7 ("[T]he timing of a plaintiff's discharge in relation to his protected activity can sometimes establish the causation element of a *prima facie* case ...." (dicta)); *Allen Health Sys., Inc.*, 302 F.3d at 833 (holding that "two events [being] extremely close in time ... is sufficient, but barely so, to establish causation, completing [the plaintiff]'s *prima facie* case").[36]

The timing in this case—just over two weeks—is unquestionably close. But since timing alone is rarely enough, key then are facts *surrounding* the protected activity and adverse employment action, with perhaps timing providing the final straw if the issue is close.

Knowledge by the decisionmaker of the protected activity is one such fact, for if the decisionmaker was unaware of the protected activity, no reasonable factfinder could decide the plaintiff's discharge occurred, as the statute requires, "because" of engagement in the protected activity. *See Buettner*, 216 F.3d at 715 ("A plaintiff must show the employer had actual or constructive knowledge of the protected activity in order to establish a *prima facie* case of retaliation."); *Riceland Foods, Inc.*, 151 F.3d at 818 ("In order to establish the third element of his prima facie case of retaliation, Thomas needed to present evidence that Riceland knew that he had engaged in statutorily protected activity"); *Simon v. Simmons Foods, Inc.*, 49 F.3d 386, 389 (8th Cir.1995) (requiring a plaintiff to show "the employer had actual or constructive knowledge of the protected conduct" in order to establish a prima facie case of retaliation); *Wolff v. Berkley, Inc.*, 938 F.2d 100, 103 (8th Cir.1991) (explaining that a causal link between statutorily protected activity and an adverse employment action "does not exist if the employer is not aware of the employee's statutorily

---

**36.** Our circuit has stopped short of saying, however, that timing along can *never* establish a *prima facie* case of retaliation. *Riceland Foods, Inc.*, 151 F.3d at 820 n. 5 (discussing *Nelson v. J.C. Penney Co.*, 75 F.3d 343 (8th Cir.1996)); *see also Franklin Nat'l Bank of Minneapolis*, 459 F.3d at 916 (noting tension between *Kipp v. Missouri Highway & Transportation Commission*, 280 F.3d at 897 (holding that "a mere coincidence of timing can rarely be sufficient to establish a submissible case of retaliatory discharge"), and *Peterson v. Scott County*, 406 F.3d at 525 ("An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation.")).

protected activity"); *see also Cole v. May Dep't Stores Co.,* 109 Fed.Appx. 839, 841 (8th Cir.2004) (finding no evidence that any person aware of a pending discrimination charge was involved in the decisions causing the alleged employment disadvantage); *City of Pine Bluff, Ark.,* 105 Fed. Appx. at 882 (plaintiff's failure to rebut decisionmaker's sworn statement that he was unaware of plaintiff's purported opposition to unlawful conduct dispositive of plaintiff's retaliation claim).

Here, Schneider contends neither Williams nor Houdesheldt told Morse—the sole decisionmaker with respect to Schoonover's termination—that Schoonover had inquired about or complained of discrimination. Schoonover argues Williams—an attendee of the August 2003 meeting—must have been involved the process culminating in Schoonover's termination because she signed the Driver/Power Term Sheet describing why Schoonover was being terminated.

Even viewed favorably to Schoonover, the record shows Morse alone decided to terminate Schoonover. The sole person who had marginal influence on Morse's decision—Sullivan—was unaware of the early August 2003 meeting between Schoonover, Williams, and Houdesheldt. And Williams's signature on the Driver/Power Term Sheet is only evidence that she understood why Schoonover's employment was ending, not that she participated in the decision to fire her. Regardless of how close in time the engagement in the protected activity is to the employee's termination, if the decisionmaker acts without knowledge of the protected conduct, a plaintiff cannot succeed. Therefore, Schoonover's strong evidence of temporal proximity does not generate a fact question on her *prima facie* case.

### 2. Schneider's Proffered Legitimate, Nondiscriminatory Reason for Schoonover's Termination.

▇▇▇ Assuming Schoonover could demonstrate a fact question on each element of her *prima facie* case of retaliation, an inference of retaliatory intent would arise, giving rise to a burden of production on Schneider to point to a legitimate, nonretaliatory reason for Schoonover's termination. Schneider claims Schoonover was terminated as a result of her failure to disclose material medical information during the application process. Schneider relies on its explanation for Schoonover's termination advanced above. That reason suffices here as well.

### 2. Schoonover's Attempt to Demonstrate the Legitimate, Nondiscriminatory Explanation for her Termination is a Pretext for Unlawful Discrimination.

▇▇▇ Because Schneider has produced a legitimate, nondiscriminatory reason for Schoonover's termination, Schoonover must then show Schneider's reason for her termination was pretextual for unlawful retaliation. Again, Schoonover relies primarily on timing.

At this stage of the *McDonnell Douglas* framework, though, Schoonover's evidence is "evaluated in light of other evidence, or lack of other evidence, in the record." *Sherman,* 235 F.3d at 410. Therefore, while a close temporal proximity might suffice to establish a *prima facie* case of retaliation, more than temporal proximity is required to demonstrate the employer's proffered reason for the employment action was pretextual for unlawful retaliation. *See Arraleh,* 461 F.3d at 978; *Franklin Nat'l Bank of Minneapolis,* 459 F.3d at 916; *Kohler,* 335 F.3d at 774 n. 7; *see also Jackson v. Flint Ink N. Am. Corp.,* 370 F.3d 791, 798 (8th Cir.2004) ("While timing alone may sometimes be

sufficient to establish a causal connection for the purpose of making a prima facie showing of retaliation, it is insufficient where ... other evidence overwhelmingly suggests another legitimate reason for the adverse employment action."), *vacated on other grounds,* 382 F.3d 869, 870 (8th Cir. 2004).

For reasons detailed above, Schoonover has not generated evidence showing the reasons advanced by Schneider for Schoonover's termination are false. The fact that the investigation uncovering the incomplete medical records occurred *between* the early-August 2003 meeting and Schoonover's termination further weakens any causal inference that could arise as a result of timing.

### C. Conclusion.

Schoonover has failed to generate a fact question on each element of her *prima facie* case of retaliation, and she has failed to demonstrate the reason offered by Schneider for her termination is pretextual for retaliatory intent. As a result, the Court must grant Schneider's motion for summary judgment on Schoonover's retaliation claim.

### IV. Conclusion.

The Court has attempted to provide a detailed discussion of why the experience related by the Plaintiff is legally insufficient to state a cause of action for discrimination or retaliation. On the basis of the foregoing discussion, Schneider's Motion for Summary Judgment (Clerk's No. 19) must be **granted.** As this Order disposes of the remaining claims in Plaintiff's Complaint, the above-entitled action is **dismissed.**

**IT IS SO ORDERED.**